**Harold BIGELOW and Virginia Bigelow, Plaintiffs-Appellants,**

v.

**AGWAY, INC., and Kemin Industries, Inc., Defendants-Appellees.**

**No. 69, Docket 74–1268.**

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1974.

Decided Nov. 21, 1974.

Peter F. Langrock, Middlebury, Vt. (Langrock & Sperry, Middlebury, Vt., of counsel), for plaintiffs-appellants.

Lawrence Miller, Rutland, Vt. (Miller & Hill, Rutland, Vt., of counsel), for defendant-appellee Agway, Inc.

Frederick DeG. Harlow, Rutland, Vt. (Ryan, Smith & Carbine, Rutland, Vt., of counsel), for defendant-appellee Kemin Industries, Inc.

Before HAYS, ANDERSON and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

In this diversity action in the District of Vermont for recovery of losses sustained by plaintiffs Harold and Virginia Bigelow when a barn on their Vermont farm burned on July 8, 1971,[1] Chief Judge Holden, after all evidence offered by both sides had been introduced, directed a verdict in favor of defendants-appellees. Because we believe there was sufficient evidence to require submission of certain of plaintiffs' claims to the jury, we remand for a new trial.

---

1. The Cooperative Fire Insurance Association of Vermont, Inc. was later joined as a plaintiff to the extent of their subrogation rights.

The Bigelows conducted a dairy farming business on their farm near St. Albans, Vermont, where for eight years prior to the events giving rise to the present action they had been engaged in "the first and most respectable of all the arts,"[2] farming. Indeed Mr. Bigelow was shortly thereafter named "Vermont's Outstanding Farmer in 1972." "A better farmer ne'er brushed dew from grass."[3] He was experienced in baling and storing of hay, producing some 18,000 to 20,000 bales annually, which were stored in the Bigelows' barn.

Although "the ripe harvest of the new-mown hay gives it a sweet and wholesome odour,"[4] it must be allowed to dry before it is baled and stored. Although hay with a higher moisture content has an apparently greater nutritive value than that which has been more thoroughly dried, there is a substantial risk that when hay with high moisture content is baled and stored it will rot or mold. The heat produced by this process correspondingly creates a risk of spontaneous combustion when the hay is stored in a confined area. Good farming practice thus requires that hay be dried to a "safe" moisture level (approximately 20% to 25%) before it is baled.

In April of 1971 Mr. Bigelow heard from Stuart Newton about a product called "Improved Hay Savor," manufactured by the defendant Kemin Industries, Inc., and distributed by the defendant Agway, Inc., for which Mr. Newton was a dealer. "Hay Savor" is a chemical preparation which may be sprayed onto hay at the time of baling. Its purpose is to retard mold growth in baled hay. It was advertised as therefore enabling hay to be baled at higher moisture levels than would otherwise be possible, thus reducing the time hay had to remain in the fields at the mercy of the weather, and also improving the nu-

tritive value of the baled hay. Another claimed effect was to reduce heating in higher moisture hay by means of retarding mold. Apparently persuaded, Mr. Bigelow purchased Hay Savor and related spraying equipment.

The event upon which the Bigelows' claim focuses occurred on June 15, 1971, when Stuart Newton and Thomas Nelson, a sales representative of Kemin Industries, paid a visit to Bigelow at his farm.[5] They accompanied Bigelow into the fields where unbaled hay lay drying. *According to plaintiffs*, Nelson at that time represented that the hay then in the field was safe for baling if Hay Savor was used. Bigelow testified that he then baled the hay despite his better judgment that it was still too green, that the hay was then placed in the center section of the barn, and that it was in this hay that a fire broke out as a result of spontaneous combustion. On the basis of this evidence plaintiffs contend that Nelson's statement that the hay was safe to bale was negligent, and that his representations constituted a warranty that Hay Savor would make the treated hay safe to bale, but that Hay Savor in fact failed to live up to these representations. There was a great deal of proof contradicting Bigelow's account of the June 15 meeting with Nelson and casting doubt upon Bigelow's claim that the fire began in bales stored on June 15. For instance, there were contradictions in plaintiff's own testimony concerning whether any untreated bales put up before Nelson's visit had been stored in the same section of the barn as those bales treated with Hay Savor.

In directing a verdict against the plaintiffs on both the negligence and warranty theories, Chief Judge Holden concluded that no competent evidence had been presented that the product Hay Savor was dangerous or defective or

---

2. Rousseau, Emile, Bk. iii.

3. Byron, The Vision of Judgment, St. 8.

4. Shakespeare, Richard III, Act V, scene 3.

5. There is some suggestion in the record that the visit of Messrs. Newton and Nelson may have occurred on June 16th rather than the 15th. Chief Judge Holden's oral opinion suggests the 15th is the correct date, and we shall so assume.

that Bigelow had relied on Nelson's statements in baling hay with a high moisture content. Moreover, the court found that there was a failure of proof that the fire started in bales of hay treated with Hay Savor after Bigelow's conversation with Nelson.

## DISCUSSION

In determining whether a motion for a directed verdict should be granted, the evidence must be viewed most favorably to the party against whom the motion is made, O'Connor v. Pennsylvania R.R., 308 F.2d 911, 914–915 (2d Cir. 1962). The non-moving party is given the benefit of all reasonable inferences from the evidence, and evidence unfavorable to it may be considered only if that evidence stands uncontradicted and unimpeached. Simblest v. Maynard, 427 F.2d 1, 4–5 (2d Cir. 1970); Kremer v. Fortin, 119 Vt. 1, 117 A.2d 245 (1955). See also 5 Moore's Federal Practice ¶ 50.02[1] (2d ed. 1974). Applying this standard, we find that, despite the proof supporting defendants' position, there was evidence upon which a jury could reasonably find for the plaintiffs.

### Evidence of Reliance

Although Bigelow never testified specifically that he relied on Nelson's representations in baling high moisture hay, a jury could infer that he did so since his testimony reveals that he treated and baled the hay in its condition at that time because of what Nelson told him. It is undisputed that during his visit Nelson employed a testing device to determine the moisture content of the hay in the field, and that the moisture level was about 32% to 34%. Asked whether he had ever baled such hay, Bigelow replied, "No, I wouldn't have." (R. 64). Bigelow suggested that Nelson's visit changed this practice, however:

"[M]ost of the hay is put up in a wind row then we just go along after the top dries, we go along with the brake and just roll it over and then we always let it dry but that particular day when he let it ride with the moisture meter, he said it was ready for baling. Bale it up, put it in the barn, don't worry about it." (R. 63).

Later Bigelow testified that he would not have baled the hay at the time of Nelson's visit because it was "too green" and that the problem with green hay is that "[i]t either molds, rots or, you will have a fire." However, he did bale the "green" hay that day after his conversation with Nelson. (R. 64, 155–56).

From this testimony a jury could reasonably have inferred that Bigelow relied on Nelson's statements in baling greener hay rather than waiting until it dried.

### Evidence of Causation of the Fire

There was substantial evidence that a "hot spot" developed in certain hay stored in Bigelow's barn, and that spontaneous combustion of this hay caused the fire. Whether the hay in which the "hot spot" developed was that stored after Bigelow's conversation with Nelson was less clear. Plaintiff, however, testified that all hay treated with Hay Savor was placed in the center section of the barn, the section in which the "hot spot" developed (R. 69), and that untreated hay was placed in other, separate sections of the barn (R. 69, 138).

From this testimony the jury might have found that the section where the fire began contained exclusively treated hay. It might also have concluded that before Nelson's visit Bigelow baled only dry hay. Bigelow's testimony about his practice (R. 64, 155–56) was supported by his good farming record and the absence of any previous hay heating problems.

Bigelow testified that the hay baled after Nelson's visit seemed unusually heavy, supporting an inference that it contained more moisture than usual. Since the chance of spontaneous combustion in dry hay is slight, the jury might reasonably have concluded that the fire began in the only green hay in Bigelow's

barn, the hay baled and stored after Nelson's assurances, and thus that the presence of this green hay was the proximate cause of the July 8 fire.

### The Breach of Warranty Claim

■ Plaintiffs' complaint alleged that products manufactured by Kemin Industries and sold by Agway to them were "defective and unfit for the purpose for which they were sold." In support of this general claim of breach of warranty plaintiffs' principal contention was that Hay Savor was defective in that it did not in fact allow farmers to put up high moisture hay, as was represented. We agree with Chief Judge Holden that there is no evidence that Hay Savor was defective or that it would not be effective if properly used. Moreover, proper usage, as specified in Hay Savor literature, required that moisture levels in hay be 25% or less before baling. Plaintiffs cannot recover on the ground that Hay Savor did not live up to its advertising claims since there is no evidence that plaintiffs complied with this instruction in using the product. See Fredendall v. Abraham & Straus, Inc., 279 N.Y. 146, 18 N.E.2d 11 (1938); Prosser, Law of Torts § 102 (4th ed. 1971).

Plaintiffs, however, contend that their broad warranty claim could be established by proof that on the June 15th visit Mr. Nelson represented that Hay Savor enabled 32% moisture hay to be safely baled, and that in fact the product failed to prevent a fire at that moisture level. Although plaintiffs may have placed most of their emphasis at trial on the properly rejected theory that the product was inherently defective, their claim was expressed in sufficiently general terms to embrace Nelson's representations, see 9A Vermont Statutes Annotated §§ 2–313, 2–315, and at trial plaintiffs' counsel asserted the latter theory. Since the elements of this claim are essentially the same as those of the negligence claim, we believe there was adequate evidence to go to the jury on the breach of warranty claim as well.[6]

### "Assumption of Risk"

Defendants urge that, even if we decide that there was sufficient evidence to send the case to the jury on plaintiffs' warranty or negligence claims, we should affirm on the ground that plaintiffs "assumed the risk" as a matter of law. Defendants point to substantial evidence that Bigelow, contrary to the advice of many, refused to remove the hot hay from his barn after becoming aware of the presence of the "hot spot," and indeed continued to add to the hay in the barn.

■ Although the court below did not reach the question of assumption of risk, we are of course entitled to affirm on any ground supported by the record. Lum Wan v. Esperdy, 321 F.2d 123 (2d Cir. 1963). We decline to affirm on the grounds defendants suggest, for two reasons. First, the arguments merely support the conclusion that Bigelow failed to avoid certain consequences of defendants' alleged wrongdoing, not that he "assumed the risk." Cf. Socony Vac-

6. Although defendants might conceivably contend that since Nelson's representations postdated the delivery of the Hay Savor used to treat the hay that allegedly combusted, and therefore could not be the "basis of the bargain" as required for recovery under 9A Vt.Stat.Ann. § 2–313, it is undisputed that the Nelson-Newton visit on June 15th was to promote the sale of the product. Thus they might constitute an actionable modification of the warranty. See Anderson, Uniform Commercial Code, Vol. 1, § 2.-313.10, p. 487.

"7. The precise time when words of description or affirmation are made or sam-

ples are shown is not material. The sole question is whether the language or samples or models are fairly to be regarded as part of the contract. If language is used after the closing of the deal (as when the buyer when taking delivery asks and receives an additional assurance), the warranty becomes a modification, and need not be supported by consideration if it is otherwise reasonable and in order (Section 2—209)." Uniform Laws Comments, Title 9A Vermont Statutes Annotated § 2–313, Comment 7, p. 101.

uum Oil Co. v. Marvin, 313 Mich. 528, 21 N.W.2d 841 (1946). Bigelow asserts that he was not aware that a hot hay situation might develop until it was discovered after the hay had been baled and stored. Assuming liability were established, he would be entitled at least to recover whatever damages he would have suffered had he acted reasonably in remedying the situation caused by defendants' negligence or breach of warranty. At best, therefore, defendants can argue in mitigation of damages that Bigelow acted unreasonably in failing to avoid the fire after becoming aware of the presence of hot hay in his barn. Clearly such an argument presents no basis for affirmance.

Second, the question of whether plaintiffs acted unreasonably in failing to remove the hay was one for the jury. Bigelow argued that an attempt to remove the hot hay would have presented him with the unreasonable alternative of risking an explosion upon oxygen suddenly mixing with the hot hay being removed, which could result in personal injury to himself and others.

### Agway's Defense

Agway argues that, even if Nelson did make certain misrepresentations, the district court's decision should be affirmed as to it since there was no evidence that any misrepresentations were made by any representative of Agway. The record is clear, however, that Newton, the Agway representative, accompanied Nelson during their joint promotional visit to Bigelow on June 15, that he was present during the representations allegedly made by Nelson, and that he did not disassociate himself from Nelson's statements. Since Newton's presence was part of a joint effort with Nelson to sell Hay Savor, his silence in the face of Nelson's representations could be construed as constituting an adoption of them.

For the foregoing reasons we reverse as to both defendants and remand for a new trial.