Gilbert R. HOROWITZ, Plaintiff,

v.

Irving ANKER, the Board of Education of the City School District of the City of New York, Frank C. Arricale II, and Anthony J. Polemeni, Defendants.

No. 73 C 1747.

United States District Court, E. D. New York.

Sept. 7, 1977.

**496**

Goldberg & Comer, New York City, for plaintiff by Joan Goldberg, New York City.

W. Bernard Richland, Corp. Counsel, City of New York, New York City, for defendants by Lorna Bade Goodman, Eileen F. Shapiro, New York City.

NEAHER, District Judge.

In this action under the Civil Rights Act, 42 U.S.C. § 1983,[1] plaintiff, a school psychologist employed by the Board of Education of the City School District of New York (the "Board of Education" or the "Board"), claims he was transferred from one bureau to another in the Board of Education in retaliation for having spoken out against what he believed were questionable actions of superiors. His suit was aimed chiefly at defendants Irving Anker, now Chancellor of the Board of Education, and Dr. Anthony Polemeni, Director of the Office of Educational Evaluation ("OEE"),[2] whom he charged with violating his constitutional right of free speech by ordering him to report for a psychiatric examination and by transferring him from his long-time post in OEE to the Board's Bureau of Child Guidance ("BCG").

Plaintiff sought compensatory and punitive damages and an injunction transferring him back to his former position. The liability and damage issues were tried to a jury,[3] which returned a verdict in favor of plaintiff against both defendants for compensatory damages in the amount of $25,000 and punitive damages against Anker in the amount of $20,000 and against Polemeni in the amount of $5,000.[4]

Defendants now move for judgment notwithstanding the verdict, Rule 50(b), F.R. Civ.P., or in the alternative for a new trial, Rule 59, F.R.Civ.P., contending that the evidence against Anker and Polemeni was legally insufficient to sustain the verdict and that it was based on highly prejudicial evidence of claimed wrongdoing with which they had no connection. For the reasons which follow, defendants' motion for judgment n. o. v. is granted.[5]

1. Jurisdiction exists under 28 U.S.C. § 1343.

2. The Board of Education was dismissed on consent before trial because it is not a "person" within the meaning of the Civil Rights Act. *Monell v. Dept. of Social Services of the City of New York,* 532 F.2d 259, 262–64 (2 Cir. 1976). Frank C. Arricale II was dismissed as a defendant on consent at the close of trial.

3. On the equitable issue tried to the court in June 1976 the jury's findings, of course, were merely advisory.

4. The trial transcript does not indicate against which defendant the $20,000 and $5,000 punitive damages were awarded. It is the court's recollection that the jury awarded damages as indicated in the text. The court may correct the record so that it be made to conform to the truth. Rule 10(e), F.R.A.P. See Transcript, pp. 1452–53 (hereinafter "Tr. ___").

In addition the jury first awarded compensatory damages of $10,000 plus legal costs, and when informed by the court that attorney's fees could not be awarded, recomputed the damage figure to the $25,000 amount. Tr. 1456–57, 1462.

5. For more than 3½ years the court has lived with this lawsuit which throughout has been characterized by repeated efforts to have the court interfere in the administration of the Board of Education, countered by bureaucratic decisions affecting plaintiff's employment status and by acrimonious charges on both sides. The parties have appeared before the court on numerous occasions, following plaintiff's failure to receive his paycheck in September 1975, his permanent transfer to the BCG, alleged harassment of plaintiff at the BCG including failure to notify him of certain vacancies, refusal to assign him work commensurate with his position, and refusal to pay him because of his

Plaintiff's case concentrated on allegations of improprieties within the Board of Education concerning the practices and procedures of his bureau, OEE, in awarding contracts to outside companies for research evaluation programs and the annual city-wide reading test. Indeed, plaintiff claims to have proven at trial the existence of "illegal, wasteful, improper and unprofessional practices and procedures at OEE" dating back to 1971.[6] Defendants maintained that plaintiff's transfer was necessary because he was a disruptive and ineffective member of the staff, "consistently at odds with his superiors" and in the end, an unsatisfactory employee who had attempted to usurp his superior's authority.[7]

A careful review of the entire record and the court's own familiarity with the sequence of events impel the conclusion that everyone, including counsel, the court and the jury, lost sight of the real issues in the case amidst the barrage of charges of wrongdoing within the Board of Education. But the Board of Education was not on trial. The fundamental issues concern solely the right of a governmental employee to speak out publicly on matters of public concern in the exercise of his first amendment rights, the right of the Board of Education as an employer to maintain order and discipline, and the authority of the employee's immediate superior to manage his department.

Plaintiff's claim is based on asserted instances of retaliatory conduct by the individual defendants because he spoke out on specific issues over a period of time between 1971 and 1973. A review of the evidence in the light most favorable to plaintiff is therefore necessary to ascertain exactly what statements were made by plaintiff and what acts were performed by each of the defendants and their causal relationship, if any, to his transfer from OEE.

### The Relevant Facts Before the Jury

On June 1, 1967 plaintiff began employment with the central Board of Education at its Brooklyn headquarters when he was appointed to the position of school psychologist in the Bureau of Educational Research for a probationary term of three years.[8] The appointment was made at the request of Dr. Samuel McClelland, then Acting Director of the Bureau, which in late 1973 became OEE and will hereinafter also be referred to as "OEE". Plaintiff was the only school psychologist in OEE, which then employed a professional staff of approximately 20 individuals, mainly in licenses of research and research assistant.

The primary functions of OEE, which reports directly to the Chancellor, were (1)

delay in turning in timesheets, treatment allegedly not accorded to others.

The long delay in disposition is the result of a confluence of several factors: the withdrawal of plaintiff's original counsel, the lapse of considerable time before plaintiff was able to retain new counsel, personnel changes in the Office of Corporation Counsel, the court reporter's refusal to transcribe the record of the November 1975 jury trial before being paid by the City, his subsequent transfer to Washington, D.C. and failure to complete transcription before March 31, 1977.

**6.** Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Judgment Notwithstanding the Verdict, filed May 9, 1977, p. 1.

**7.** Defendants' Memorandum of Law in Support of Motion for Judgment N.O.V., filed April 5, 1977, p. 3.

**8.** DX–Q. Prior evaluations of plaintiff by former supervisors noted the following:

"had . . . controversy with the principal or other school authorities or with teachers" (DX–I, J);
"failed to show integrity, self-command, courtesy, regard for democratic ideals or respect for the lawful authority" (DX–I, J);
"capacity for winning and holding the respect of adults (co-workers, parents, etc.) . . . not quite satisfactory" (DX–J);
"his whole conduct was immature; with implications of threats etc." (DX–J);
"relation to colleagues . . . somewhat inadequate" (DX–K);
"relation to supervisors . . . somewhat inadequate . . . success in general treatment, follow ups, etc. . . . somewhat inadequate" (DX–K, M);
"failed to show industry, integrity, self command, courtesy, or respect for lawful authority" (DX–L) (see also DX–TT).

the central evaluation of educational programs involving over $100,000,000 in federal and State aid; (2) city-wide testing and test development; (3) administering the annual achievement tests; (4) independent audits; and (5) approving all research on the City schools.[9] Plaintiff was engaged primarily in research and statistical work, writing critiques of proposed programs, designing and evaluating programs and developing psychometric techniques and tools. On June 1, 1970, having rendered satisfactory service during his probationary term, plaintiff's appointment as school psychologist was made permanent and he obtained tenure in that license.[10]

The performance of pedagogical employees of the Board of Education is rated at the end of each school year by their supervisors. From the commencement of his employment until and including June 1973, plaintiff's performance was rated satisfactory. In June 1974 plaintiff was rated unsatisfactory by Polemeni. The rating was upheld on appeal. What happened during that school year, September 1973 to June 1974, is the nub of this lawsuit.

As part of this general review, as previously noted, n. 8 *supra,* it appears that former employers of plaintiff had criticized his performance and his ability to get along with his fellow employees and superiors. Also well documented and not seriously contradicted, apart from his assertion that he was treated differently than other Board employees, are plaintiff's chronic difficulties with lateness, absences and conforming to regular hours of employment due to medical and other reasons.

Before we turn to the 1973–1974 incidents which really gave rise to this action, it is necessary to mention briefly prior events which formed the bulk of plaintiff's proof at trial. The evidence was obviously offered to show that Anker and others were aware of plaintiff's successful challenge to questionable practices of the Board's bureaucracy and thus had a motive to retaliate against him whenever an opportunity arose.

The first of these occurrences took place in the spring of 1971, after McClelland sent plaintiff several letters demanding explanations for plaintiff's absences or lateness. In one response to McClelland plaintiff intimated knowledge of improper behavior within OEE in respect of bidding procedures.[11] McClelland sought Anker's approval to arrange for the transfer of plaintiff to the Bureau of Child Guidance ("BCG"), representing that plaintiff wanted to work with children and no longer found his work at OEE congenial or appropriate. Plaintiff, in a letter to Anker, resisted, stating he wished to remain in OEE, that any transfer would be involuntary, and requested a meeting. There is no evidence as to what action Anker took, if any, with respect to the letters or that he even personally received them. In any event plaintiff received no response, no meeting with Anker was held and no transfer took place.

The upshot of the matter was on the basis of information supplied by plaintiff, then Chancellor Harvey Scribner requested the City Department of Investigation to look into the situation and plaintiff's transfer to BCG was rescinded. Commissioner Robert K. Ruskin later wrote Chancellor Scribner suggesting new procedures be adopted for letting evaluation contracts. Plaintiff acknowledged at trial that the rec-

**9.** See Affidavit of Dr. Anthony J. Polemeni filed December 4, 1973, ¶ 2.

**10.** It is disputed whether an employee of the central Board is tenured in his Bureau or simply in the central Board by license.

**11.** In his memorandum to McClelland of March 2, 1971, plaintiff stated, "I am, as well, gathering information at the present time which will lay the basis for actions which are available to me based upon numerous violations of what is

considered standard operating procedure in administration." DX–W. Tr. 313. At trial plaintiff testified he learned in 1971 that contracts between OEE and outside firms for amounts greater than $5,000 were to be let by competitive bidding but, as a general rule, were not. Instead, McClelland awarded such contracts without competitive bidding to companies which had not submitted the lowest bid and to firms which employed or were headed by former employees of the Board of Education.

ommended procedures were ultimately implemented. McClelland was removed as director of OEE and subsequently retired.

From the foregoing the jury could have found that the early attempt to transfer plaintiff was an act in retaliation or to prevent plaintiff from speaking out about improper letting of contracts in OEE. But the sole aggressor apparent from the evidence was plaintiff's supervisor McClelland who was not named as a defendant. Despite plaintiff's promises at trial to link the act to Anker, the sole wisps of any involvement are the communications concerning the "voluntary" transfer. But neither of these communications makes reference to plaintiff's allegations and both are directed to the Deputy Chancellor in a titular manner. Moreover, when plaintiff's position was later abolished, it was done over Chancellor Scribner's signature, with no indication of any participation by Anker.

The next event occurred in late 1972. Following McClelland's resignation, Chancellor Scribner had appointed Dr. David A. Abramson as Acting Director of OEE early in 1972, with the specific charge of reorganizing the bureau. In the fall of 1972, Abramson recommended that research designs for evaluation projects, which were being contracted to outside agencies, be performed in-house, that is, by OEE personnel. This recommendation was followed. He also recommended that the evaluations themselves be done in-house as more economical based upon a cost estimaté prepared by OEE, but this recommendation was not followed by a Bid Review Committee, which had been established by Chancellor Scribner to pass upon and award contracts. Anker was not a member of the Bid Review Committee but sometimes met with it.

In accordance with its usual practice, the Board of Education held a public meeting on December 20, 1972 to pass upon, *inter alia,* the award of four OEE evaluation projects to outside firms. Plaintiff appeared as a private citizen at that meeting and gave a statement, which is set forth in full in the margin.[12] Essentially, plaintiff told the Board that if OEE performed evaluations instead of awarding outside con-

---

**12.** As transcribed, it is as follows:

"I'm Gil Horowitz, representing myself as a New York City taxpayer tonight, although, I am a member of our staff in the Bureau of Research.

"Members of the Board, Dr. Scribner, although I have met with several members of the Board and Dr. Scribner on previous occasions, this is the first time I have had the pleasure of meeting everybody at once. Hello.

"In regard to Item 9(a, b, c and d), let me say that these items are only the cap on the iceberg. These are part of a series of some thirty projects, which are to be let for outside contracts, according to my understanding, which will cost the city approximately one quarter of a million dollars for the aforementioned package more than should be expended as indicated by a recent analysis by the Bureau of Educational Research. This analysis by the Bureau of Educational Research presumes that only qualified research personnel would be used in the execution of evaluations.

"In actuality, if history is a guide, there is little reason to believe that only qualified research personnel would in fact be used by the outside agencies. Only today, I was informed by a key administrator of the College Bound Program, that their summer program was evaluated primarily by college students employed by an outside agency at $2.85 an hour, whose task it was to evaluate teacher performance. Obviously, the college students were not qualified for this research task.

"My information is, that were we to use the outside agencies, we would be overspending, without qualified personnel, again if history is a guide, roughly one quarter of a million dollars for the upcoming more than twenty projects not included in (a, b, c and d). For the upcoming College Bound Program, for example, it is estimated that we would be spending some $70,000 for the coming year. In my opinion, much more than our analysis indicates and in my opinion much more than we should be spending. This together with some twenty-odd other programs, would lose us one quarter of a million dollars for every loss to the children of the city.

"My advice is simple. Regardless, of what we do with 9(a, b, c and d), we should re-examine the upcoming package of the twenty odd programs in order to not lose the one quarter million dollars. The B.E.R. estimated that it could do the job for roughly $250,000; less than the figures that the outside agencies would be employing, less than qualified research personnel for. Thank you." PX–18.

tracts, the city could save a quarter of a million dollars. A Board member asked in what connection OEE had made the estimate. Deputy Chancellor Anker responded that the Bid Review Committee and he were awaiting a report from Dr. Abramson, to be forwarded to the Chancellor, regarding evaluations which could be done by OEE and those which required employment of additional consultants. The same Board member commented that he saw no reason why evaluations could not be done in-house in the future, with better quality, and that he would like OEE to make that determination. However, the Board did adopt the items without opposition.

Plaintiff's statement was a classic exercise of first amendment rights—a public statement on a matter of public concern as a citizen. See *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). No retaliation would have been constitutionally permissible. No evidence thus far, however, points to any proximate reprisal by these defendants because of plaintiff's remarks. Polemeni had not yet been appointed Director of OEE and only later was apprised of plaintiff's speech. The most that can be said is that Anker was aware and Polemeni became aware that plaintiff publicly spoke on the matter of in-house evaluation of contracts and believed OEE evaluations would be more economical. This is not to say that retaliation must be immediate in time to be actionable. But the more remote the constitutionally protected conduct from the claimed abridgement, the more unequivocal must be the proof on the issue of causation or motivation.

The prelude to the incidents really leading to this controversy began in March 1973 when Chancellor Scribner appointed Polemeni as Acting Director of OEE. Polemeni soon made it clear to his staff that he would not be told what to do by any staff member.[13] In May, Polemeni received a complaint signed by 16 staff members, including plaintiff, expressing concern over seeming downgrading of assignments. As an example of downgrading, as perceived by plaintiff, on May 4, 1973 Polemeni changed the Math Skills project, which originally was to have been supervised by an OEE staff member, Fred Smith, assisted by outside consultants and to require 250 man days for completion, to a joint assignment between Smith and plaintiff, without outside consultants and with a much shorter deadline. Though this decision may have made heavier demands on the staff, it was clearly consonant with the in-house policy plaintiff advocated and Anker had said was under consideration at the 1972 Board meeting.

In June 1973 plaintiff received several reprimands from Polemeni over lateness in turning in monthly service reports and for spending over 50% of his working time on the Reading Study. Nonetheless, plaintiff's application for summer employment was granted by Polemeni, the ordinary employment term coinciding with the September-June school year.[14]

Near the end of the summer Polemeni complained that plaintiff had failed to complete assignments and that one report which had been submitted was unacceptable and had to be reassigned. Plaintiff's response, contained in a memorandum to Polemeni of August 22, 1973, was that he had not received the assignments, but he would give them priority now that he was apprised of their importance.[15]

---

**13.** See Memorandum from Frederick Smith, DX–DDD.

**14.** Plaintiff had not received summer employment during 1971 and 1972.

**15.** Plaintiff wrote that, since the priority need of the assignments had been more clearly expressed, as soon as he received a verified list of assignments and materials, he would expedite them. He further explained that he had been engaged as part of his summer work in developing a reading test, stating:

"In further explanation, other activities have engaged my time somewhat, including the development of a research proposal involving criterion referenced reading tests which could conceivably save the City of New York millions of dollars over a very few years. Should you wish to discuss this aspect of my summer work with me, I will certainly be

Plaintiff's testimony, which we must accept, was that he never received notice of some of the assignments because notices were placed on other desks or never sent, and that the unsatisfactory project design was due to the typist's failure to type plaintiff's entire draft, although he admitted not proofreading the design before submitting it. The evidence is uncontroverted that, for whatever reason, plaintiff had completed *no* summer critique assignments midway through the summer term.

At the beginning of the 1973–74 school year there occurred the speaking out which plaintiff claims led to immediate retaliation by defendants. On September 10 Dr. Richard Turner, who had headed the OEE evaluation processing unit, was appointed Assistant to the Director. Polemeni announced the appointment at a staff meeting attended by Turner. Plaintiff was also present and criticized the appointment by standing up and reading aloud a letter he had written to the NAACP deploring the appointment of someone whose "undistinguished career" was notable in two respects, referring to Turner's responsibility for two research projects with conclusions adverse to racial integration. Polemeni testified that plaintiff's action created a tension in the room so great "you could cut it with a knife" and completely disrupted the meeting.

The next day plaintiff received a memorandum from Polemeni directing him to change his office from Room 712 to Room 743. Plaintiff's room change was one of nine rearrangements among the professional staff which Polemeni made in his September reorganization. Plaintiff refused to move, telling Polemeni he considered the order retaliatory, to which Polemeni replied

that it might be, stating "I'm not saying it is. But even if it were I can get away with it." [16] There followed a series of memoranda sent daily by Polemeni to plaintiff from September 14, 1973 to November 21, 1973 ordering him to move. Plaintiff paid no attention and, after conferring with his colleagues, considered his refusal to move a minor infraction to which little consequence would be attached.

The evidence is uncontradicted that, among other incidents, plaintiff also refused to confer with Polemeni unless another staff member was present, would not deliver Polemeni's messages to other staff members, refused to give the office any reason why he was absent contrary to office policy, and harassed Polemeni by such statements as that another staff member said Polemeni was incompetent or that Polemeni would soon be gone.

On its face the room assignment incident is a petty conflict. Standing alone, a superior's direction to a subordinate to move his office, even if made after the subordinate's exercise of a constitutional right, hardly rises to the level of a constitutional violation. See, *e. g., East Hartford Education Association v. Board of Education,* 562 F.2d 838, p. 856 (2 Cir.), decided *en banc* August 19, 1977. Plaintiff's own appraisal of the lack of seriousness of his refusal is consonant with that view.

The matter, however, did not end there. On September 21, 1973 Polemeni wrote to Anker requesting a medical examination of plaintiff under New York Education Law § 2568. Six reasons supporting the request were enumerated as set forth in the margin.[17] Anker authorized the examination, although plaintiff wrote him objecting to it.

happy to inform you of what progress I have made in this regard." DX–OO.

**16.** Tr. 348.

**17.** The reasons given by Polemeni for the examination were:

"1. Refusal to comply with directives (after many requests on the part of the Acting Director).

2. Refusal to confer with Acting Director at request of Acting Director.

3. Inadequate performance of duties.

4. Delinquent performance of duties.

5. Arrogates unto himself authority of the Acting Director.

6. Unprofessional conduct. (At a staff conference on September 10, 1973, in full presence of the professional staff, made unwarranted, unprofessional, and unsubstantiated charges against another staff member)." PX–19.

Plaintiff reported for the medical examination sometime in October 1973. It was conducted by two Board physicians who gave him a short physical examination, apparently cursory, followed by a longer interview. They recommended examination by a psychiatrist. Plaintiff was ordered to report to a panel psychiatrist for examination on October 26, 1973 by letter signed by Dr. Leibowitz, the School Medical Director. Plaintiff wrote Leibowitz on October 25, 1973, with a copy to Anker, that he would not appear, explaining his desire to consult with his attorney. He also declined to appear for a second appointment with the psychiatrist, scheduled for November 12, 1973.

Meanwhile on October 12, 1973, Polemeni sent a memorandum to Anker as a follow-up to a monthly report, identifying plaintiff as the individual who was having a negative effect on his professional staff, and informing Anker he intended to file charges of insubordination. He reported an incident of that day in which plaintiff attended a meeting of the Reading Study Committee in Polemeni's office to which he had not been invited. When asked to leave because he was not a member of the Committee plaintiff refused and remained throughout the meeting. This incident was repeated at a second meeting held October 26, 1973. When plaintiff refused to leave, the meeting was adjourned.

Plaintiff testified that he worked on the Reading Study and that the other members had indicated he should remain. Whatever plaintiff may have believed his status to have been, it is clear that in the eyes of his superior, Polemeni, plaintiff was not and had not been on the Committee, and had

been previously reprimanded for spending working time on the study.

In a second memorandum to Anker dated October 29, 1973, Polemeni, apparently referring to plaintiff's refusal to undergo the psychiatric examination, straightforwardly made clear his intention to remove plaintiff from OEE. Polemeni stated that if plaintiff "be found unfit for duty" he assumed plaintiff would be removed and that if plaintiff "be found fit for duty" he would file charges of insubordination. He requested Anker's cooperation in resolving the matter.

On November 2, 1973 plaintiff instituted a grievance proceeding to have removed from his file the request for a medical examination because the reasons given were inaccurate.[18] Polemeni agreed to confer and then after the meeting sent plaintiff a list of questions asking specification of the grievance. When plaintiff sought to meet with Polemeni to clarify whether the grievance had been denied, a prerequisite for Step 2, Polemeni refused to talk with him and sent for a security guard to have plaintiff removed from the office. Plaintiff quietly left with the guard.

Polemeni's third communication to Anker was a confidential memorandum dated November 12, 1973, requesting advice on possible suspension of plaintiff. In strong terms he wrote of the "disruptive, demoralizing influence" plaintiff had on the staff of OEE, stating that "I understand I cannot request suspension on the basis of allegation. At the same time, I do not feel that the [OEE] can progress normally as long as Mr. Horowitz remains on duty." Polemeni then listed 16 charges against plaintiff, set forth in full in the margin.[19] These includ-

---

18. The grievance was initiated pursuant to the contract between the United Federation of Teachers, Social Workers and Psychologists Chapter, and the Board.

19. The charges in full were:
    "1. Refused to comply with my directives.
    2. Refused to confer with me.
    3. Inadequately performed his duties.
    4. Performed his duties in a delinquent manner.

5. Arrogated to himself the authority of the Acting Director.
6. Conducted himself in an unprofessional manner.
7. Refused to leave a conference to which he had not been invited and caused the meeting to be adjourned.
8. Refused to leave my office, and had to be ejected by the security guard.
9. Could not, on many occasions, be located within the precincts of the Office of Educational Evaluation during working hours.

ed plaintiff's refusals to leave Polemeni's office and conferences to which he had not been invited, inability to be located in his office and unprofessional conduct, which Polemeni testified referred to the speech regarding Turner's appointment.

On November 20, 1973 plaintiff received a temporary administrative transfer from OEE to BCG, effective November 21, 1973. This transfer did not go into effect. By commencing this lawsuit on November 27, 1973, plaintiff obtained a temporary restraining order against the transfer and the psychiatric examination. After expiration of the temporary restraining order, on December 10, 1973, plaintiff received another temporary transfer to BCG for an indefinite period. The operative notices of transfer were signed by Frank C. Arricale II, Executive Director of Personnel.

Plaintiff reported to BCG in January 1974 and remained there under the temporary transfer until September 1975, at which time he was formally transferred to the BCG. He testified that when he first reported, he was not given any assignment and later was given a clerical task, not commensurate with his abilities, although his salary was not diminished.

Polemeni's last professional contact with plaintiff was to rate his performance for the 1973–1974 school year as unsatisfactory. Plaintiff appealed but the rating was upheld on appeal by the Chancellor's Committee and, at their recommendation, by Chancellor Anker.[20]

## Discussion

To warrant a grant of judgment notwithstanding a jury's verdict, the evidence must be "such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict". *Brady v. Southern Railway Co.*, 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943); *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 742 (2 Cir. 1975). Furthermore, the court must view the evidence in the light most favorable to the party opposing the motion and give him the benefit of all inferences fairly supported, even though contrary inferences might reasonably be drawn. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Simblest v. Maynard*, 427 F.2d 1, 4 (2 Cir. 1970). And unfavorable evidence, to be considered, must be uncontradicted and unimpeached. *Bigelow v. Agway, Inc.*, 506 F.2d 551, 554 (2 Cir. 1974).

Having these principles in mind, the court is satisfied that the evidence before the jury was wholly insufficient to support a verdict against either defendant.

Preliminarily, it should be noted that plaintiff has suffered no loss of employment, salary or tenure as a result of the defendants' actions. Four years after his transfer to BCG he still remains employed by the central Board of Education in his license of school psychologist in a depart-

10. Refused to accept written memos from me (said 'I do not store garbage').

11. Refused to accept mail addressed to 'Mr.' Horowitz. Struck out 'Mr.' and substituted 'Professor'.

12. Told the office Payroll Clerk that he did not care if his absence was considered insubordination because the 'entire Bureau will be subpoenaed to appear in court.'

13. Told my secretary, when she attempted to hand him a memorandum from me, to 'Have Mr. Polemeni have Mr. Anker deliver it to me personally'.

14. Lost data that he had collected for an evaluation report and then, in a written memo to me, intimated that the data had been stolen. (The evaluation report of a funded program has still not been submitted).

15. Refused to accept a memo from my secretary because he was addressed as 'Mr.' and I was titled 'Dr.'. Said he would accept the memo if my secretary would re-type it calling me 'Mr.' and him 'Professor'.

16. Made what he called, 'intemperate responses' to the Acting Director of the Bureau of Educational Research. Then explained these 'intemperate responses' by stating, 'unusual psychological pressures combined which caused me to appear unworthy of your trust'." DX–FFF.

20. The appeal was taken pursuant to § 105–a of the By-laws of the Board of Education. Plaintiff introduced evidence that the rating was not timely given as required by the By-laws, but did not show any prejudice therefrom.

ment staffed by similarly licensed school psychologists. Having in mind the balance that must be struck between the interests of plaintiff "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs", *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), the evidence ought to be clear and convincing that plaintiff's conduct was protected by the First Amendment and that his transfer under the circumstances was in fact punishment for exercising his rights and not for the purpose of preserving the orderly administration of OEE.

Essential to plaintiff's case was proof that the statements he claims resulted in his transfer were such as to be fairly within his right as a school employee to comment on matters of public interest in the operation of the school system. *Pickering v. Board of Education, supra,* at 568–570, 88 S.Ct. 1731. Although the evidence ranged over statements and activities of plaintiff dating back to 1971, the record is clear that the only statements which could have played a part in his transfer were contained in his criticism of Dr. Turner's appointment as Assistant Director of OEE on September 10, 1973.

That statement, made in the non-public form of a staff meeting, directly criticized his immediate supervisor's administrative decision and was directed against the professional worth of a co-worker, both persons with whom he had intimate contact in the course of his daily work. The remarks ineluctably called into question Polemeni's authority over his staff and had the potential for disruptive impact on the operations of OEE. To be sure, plaintiff's criticism was influenced by his belief that Turner held negative views on racial integration in the schools. But whether plaintiff's belief was correct—and there is substantial dispute of the accuracy of his statement—the main import and intention of the speech was not to champion integration, but to challenge directly the wisdom of Polemeni's appointment and the reputation of a fellow employee.

Viewed in context, the Turner criticism was not protected comment, nor would the events which followed it support plaintiff's claim of harassment and retaliation for speaking out. Polemeni's order the next day changing room assignments was directed to eight other staff members besides plaintiff. The order, moreover, coincided with the beginning of the first full school year following Polemeni's appointment as director and was intended to carry out a decision to reorganize OEE.

Whatever may have been plaintiff's state of mind, his repeated refusals to comply with Polemeni's order and his other antics could only be viewed as either plain insubordination or an indication that he might have problems requiring medical attention. Under the circumstances, Polemeni's recommendation of a medical examination for plaintiff comported with his supervisory authority and responsibility under the New York Education Law, § 2568. That two Board physicians, after seeing plaintiff, recommended a psychiatric examination adds further support to the propriety of Polemeni's decision. Plaintiff's refusal to undergo such examination left Polemeni with no alternative but to separate him from the OEE in order to maintain discipline, preserve harmony among the staff and promote concentration on the work to be done. See *Pickering v. Board of Education, supra,* n. 3 at 570, 88 S.Ct. 1731.

■ The evidence of retaliatory action by Chancellor Anker is even more lacking in substance. At the outset, it must be noted that liability of a defendant for deprivation of civil rights under § 1983 is predicated only upon a sufficient showing of that defendant's personal responsibility for the claimed constitutionally impermissible conduct. It is not founded on his official position. The doctrine of *respondeat superior* does not apply. *Williams v. Vincent,* 508 F.2d 541, 546 (2 Cir. 1974); *Johnson v. Glick,* 481 F.2d 1028, 1033–34 (2 Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973); *Morpurgo v. Board of*

*Higher Education in the City of New York,* 423 F.Supp. 704, 713 (S.D.N.Y.1976).

Apart from Anker's official acts as Chancellor in approving subordinates' requests which were facially supported by reasons, plaintiff is left only with Anker's presence during plaintiff's speech at the 1972 Board meeting, n. 12 *supra,* as proof of any intent to retaliate when Anker approved the request for plaintiff's transfer to BCG nearly a year later. This is so because Polemeni's later remark to plaintiff that neither he nor the Chancellor "bought the public citizen bit on Board time" was not binding on Anker and, in any event, was not a threat to retaliate in the future for something said in the past. Moreover, it must be noted that in the sense that plaintiff's speech at the Board meeting was directed against the practice of using outside contractors for evaluations, Anker was in agreement. The solution finally adopted by Anker ended contract awards to outside firms and substituted the use of consultants to assist OEE performance, a proposal which Anker said at that meeting was under advisement.

In sum, plaintiff failed to show any causative nexus between his exercise of legitimate First Amendment rights and his transfer from his position in OEE. On the contrary, the evidence established without contradiction that plaintiff spent over 50% of his working time in spring 1973 on a project to which he had not been assigned, reported in August 1973 that he had failed to complete assignments, not only because he had not received notice but because he was working on his own project, the development of a reading test, openly criticized his superior's appointment of an assistant, refused to move his office when directed, refused to leave meetings of the Reading Study Committee to which he had not been invited, and was unaccountably late or absent on a number of occasions.

The conclusion is inescapable that the jury's verdict in plaintiff's favor was contrary to the evidence and placed him in a better position than he would have been solely because he claimed to have exercised constitutionally protected conduct. But as

the Supreme Court recently noted, a school employee "ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision . . . on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision." See *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 286, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977).

Accordingly, defendant's motion for judgment notwithstanding the verdict is granted, the verdict herein is set aside and the Clerk is directed to enter judgment in favor of defendants dismissing all claims in the complaint upon the merits without costs. Settle form of judgment on notice.

SO ORDERED.