David DOWNIE and Dwayne Bereska, Plaintiffs,

v.

ABEX CORPORATION, a corporation, Defendant-Appellee/Cross-Appellant,

v.

GENERAL MOTORS CORPORATION, a corporation, Third-Party Defendant-Appellant/Cross-Appellee.

Nos. 82–1368, 83–1369.

United States Court of Appeals, Tenth Circuit.

Aug. 20, 1984.

James W. Gilson, Salt Lake City, Utah (L. Ridd Larson, Salt Lake City, Utah, with him on briefs) of Ray, Quinney & Nebeker, Salt Lake City, Utah, for Abex Corp.

H. James Clegg of Snow, Christensen & Martineau, Salt Lake City, Utah (Dennis C. Ferguson of Snow, Christensen & Martineau, Salt Lake City, Utah, and Otis M. Smith, Gen. Counsel, David W. Graves, Jr. and Judith Zakens, General Motors Corp., Detroit Mich., with him on the briefs), for General Motors Corp.

Before DOYLE and LOGAN, Circuit Judges, and CHILSON, District Judge.*

LOGAN, Circuit Judge.

In this diversity case David Downie and Dwayne Bereska, Canadian citizens employed by Western Airlines at Calgary International Airport, filed suit in federal district court in California against Abex Corporation to recover damages for injuries they suffered from the collapse of an airplane passenger loading bridge (Jetway) manufactured by Abex. The court granted Abex's forum *non conveniens* motion to transfer the case to Utah, the place where it manufactured the Jetway. After the transfer, Abex filed a third-party complaint stating a direct cause of action against General Motors Corporation (GM). GM manufactured the part that allegedly caused the Jetway to collapse. Before trial Abex settled the claims of Downie and Bereska. Abex sought recovery from GM for $83,224.71, the cost of reparing the Jetway, and $150,000, stipulated as the reasonable amount paid in settlement of plaintiffs' personal injury claims.

In submitting the case, the trial court asked the jury to complete a special verdict form on the comparative fault of Abex, GM, and plaintiffs. The jury found that defects in manufacturing or design on the

---

* Honorable Hatfield Chilson, Senior United States District Judge for the District of Colorado, sitting by designation.

part of both Abex and GM caused the Jetway collapse. It apportioned sixty-five percent of the fault for the personal injuries and property damage to Abex and thirty-five percent to GM. The jury also found that GM breached a post-sale express warranty that its ball-screw assemblies would not fail. The jury found total damages of $237,784.88, of which $150,000 was for personal injuries to plaintiffs and $87,784.88 for property damage.

The trial court granted GM's motion for judgment n.o.v. on the express warranty issue but upheld the jury's strict liability verdict. It entered an amended judgment awarding Abex $83,224.71 (thirty-five percent of the total damages). Both parties appeal. Because we conclude that the trial judge erroneously granted GM's motion for judgment n.o.v. on the express warranty issue, we do not decide any of the issues applicable to the strict liability claims.

## I

The Jetway was designed to provide an enclosed walkway from an airline terminal to an aircraft. To accommodate the different aircraft heights, it utilized a ball-screw assembly to raise and lower the Jetway. GM designed and manufactured the ball-screw assembly. GM manufactures ball-screw assemblies ranging in size from ³⁄₁₆ of an inch to six inches in diameter. But Abex purchased only three- and four-inch assemblies, and it used a four-inch assembly in the Jetway involved here.

The screw and nut assembly manufactured by GM operates much like an ordinary nut and bolt. However, rather than the lands and grooves of the nut and bolt actually engaging each other, the nut is equipped with bearing balls that circulate in the concave grooves of the screw and nut. Thus, the bearing balls carry all loads imposed by the screw. For the ball-screw assembly to function properly the ball bearings must be diverted from one end of the ball nut and carried by ball guides to the opposite end of the ball nut. To accomplish this, the ball-screw assemblies are equipped with four yolk deflectors that direct the balls into three recirculating tubes. If the ball bearings fall out of the assembly the screw can free-fall through the nut. Apparently, however, if the ball bearings are lost from the assembly, the yolk deflectors will loosely engage in the grooves of the screw and act as a thread to prevent complete runout of the screw. Abex contends that GM expressly warranted this fail-safe feature of yolk deflectors for both the three- and four-inch screws. *See* Pl. Exs. 7 and 7a. According to GM, in the three-inch assemblies the tolerances within the nut are such that when all the ball bearings are removed, the yolk deflectors remain in contact with or "interfere" with the screw and cause the assembly to act like an ordinary nut and bolt. However, GM states that in the four-inch assembly the deflectors do not engage the screw and furthermore are not designed to engage the screw with the bearing balls removed.

Abex installed a four inch ball-screw assembly with yolk deflectors in the Calgary Jetway in September 1977. According to Abex, when the bridge collapsed in January 1978 a limit switch and plate weld failed, allowing the screw to overtravel up through the ball nut. Subsequent investigations revealed that the yolk deflectors on this four-inch assembly failed to engage with the nut. GM disagrees with Abex's version of the accident. In addition to its contention that the yolk deflectors were not designed to engage with the four-inch screw, GM argues that the accident would have occurred even if the yolk deflectors had engaged. GM asserts that this proposition is true because once the screw was driven upward through the nut and above the last deflector, all the ball bearings fell out, causing the entire load to rest on one deflector. GM argues that one deflector would not bear such a load. GM believes that the screw assembly did not fail because of any internal malfunction such as loss or breakage of bearing balls within their circuits. Rather, it contends, the Jetway collapsed because Abex's limit switches and welded washers failed to stop the screw from being driven through the

nut, with the result that the screw-nut assembly was literally disassembled.

## II

### A

■ Abex contends that the trial court erred in granting GM's motion for judgment n.o.v. on the express warranty issue. A trial judge may grant a motion for judgment notwithstanding the verdict only if "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969). Further, in considering a motion for judgment n.o.v. the trial judge must consider all the evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is directed. *Wilkins v. Hogan,* 425 F.2d 1022, 1024 (10th Cir.1970). Section 2–313 of the Uniform Commercial Code governs express warranties. It provides:

"(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."

Thus, we must determine whether a rational jury could have concluded that GM made an affirmation of fact or promise concerning the failed ball-screw assembly, and, if so, whether it could find that affirmation of fact or promise became part of the basis of the bargain.[1]

### B

■ The original GM warranty was limited to defects in materials and workmanship and specifically excluded all other express or implied warranties. However, the evidence would permit a reasonable jury to find that on at least three occasions GM represented to Abex that its ball-screw assembly was fail-safe and would prevent a free-fall of the Jetway even if the bearings fell out of the assembly.

First, there was the following testimony concerning an exchange that took place on March 30, 1977, when GM employees John Martuch and Lowell Smith made a sales maintenance call on the Jetway manufacturing facilities in Ogden, Utah:

"Q. (by Abex's counsel) And at that time did either you or Mr. Smith state to Russ Williams and Bob Saunders that if the balls were lost and the deflectors were in place, that there would be interference and there would be no free-fall?

A. (by Mr. Martuch) That is correct.

Q. And there was discussion about that being a fail-safe feature; isn't that correct?

A. That is correct.

Q. And in that discussion neither you nor Mr. Smith limited that statement to the 3-inch ball screw?

A. We were talking about specifically a 3-inch ball screw.

Q. But no one said 3-inch, did they?

A. They didn't have to. There was a print on the table that we were using as a reference that was a 3-inch ball screw.

Q. But no one said, 'We want to make perfectly certain that we're only talking about that drawing'?

1. General Motors apparently argues that Utah law should apply to both the strict liability and express warranty issues in this case. Although GM takes the position that Utah conflict of laws rules would require the application of Canadian law to the strict liability issue, *see Velasquez v. Greyhound Lines, Inc.,* 12 Utah 2d 379, 366 P.2d 989 (1961), *overruled on other grounds, Harris v. Utah Transit Authority,* 671 P.2d 217, 222 (Utah 1983), it does not cite any authorities or explain why Canadian law should apply to the express warranty claim. We believe that either Utah or California law governs the express warranty issue. Because both states have adopted identical versions of UCC § 2–313 and have applied this section similarly, we need not determine which state's law applies.

A. We were talking about that assembly.

Q. But you never pointed that out, did you?

The Court: Gentlemen, Let's not talk two at one time. She's got to take everything here.

Q. (by Abex's counsel): You never specifically said that, though, did you?

A. Not that I remember."

R. X, 106–07.

Second, Martuch sent a letter to Abex dated April 7, 1977, which referred specifically to life/load charts for "the 3 inch and 4 inch BCD units you use." Pl. Ex. 8. The letter included ten copies of a document describing the design and operation of the patented yolk deflector system. The document stated, "If all balls should be lost from a ball nut equipped with deflectors, these yolk-type units will then cause the ball nut to function as a threaded nut. This is a true fail safe feature." Pl. Ex. 7.

Third, GM invited Kenneth Noall and Russell Williams of Abex's Jetway division to Saginaw, Michigan, in May 1977 to observe a test of the fail-safe features of the ball-screw assembly. The test impressed Williams and he asked for and received the test sample. Noall remarked that the fail-safe feature was "worth its weight in gold to our customers." R. IX, 109.

GM argues that all discussions and representations regarding the safety of the ball-screw assemblies were limited to the three-inch assembly, and that the evidence unequivocally establishes that no one from

Abex specifically recalled the use of the words "fail-safe" either during the conversations in Ogden or the testing in Saginaw. However, regardless of whether anyone specifically used the words "fail-safe," the literature on the ball-screw assemblies described the yolk deflector mechanism as a "fail safe feature" and did not distinguish between three- and four-inch assemblies. Pl.Ex. 7.[2] In 1977 the three- and four-inch ball-screw assemblies were the only assemblies with yolk deflectors that Abex used in its passenger loading bridges. GM knew that Abex used three- and four-inch assemblies to elevate the bridge. More important, GM, in an internal memorandum, acknowledged Abex's keen interest in the safety features of both the three- and four-inch assemblies. Lowell Smith, in a consumer contact report, stated, "I was requested by Bob Saunders of Jetway to supply a written communication to verify the deflectors in the 3″ or 4″ BCD ball screws will support the $10^{6''}$ load rating with the balls removed from the ball nut." Pl. Ex. 13. Kenneth Noall testified that he understood that the load compression test in Saginaw applied to all ball-screw assemblies equipped with yolk deflectors, R. IX, 105–06, and Russell Williams declared that GM never stated that its tests or representations were limited only to the three-inch assemblies. *Id.* at 230–31.

■ GM contends that even if GM salesmen and Abex engineers used the word "fail-safe," the use constituted mere puffing rather than any affirmation of fact or promise giving rise to an express warranty.

2. The full text of Plaintiff's Exhibit 7 is as follows:

"*Design Considerations for Maximum Reliability* (con't)

*Deflection Yokes vs Pickup Fingers* —There are currently two generally used methods of deflecting the bearing balls from the active circuit to the return tube—yoke deflectors and pickup fingers. The yoke deflectors are a patented innovation of Saginaw designed to provide the utmost reliability. Pickup fingers are simple extensions of the return tube guide and normally provide long trouble free service. However, obstructions in the ball groove, such as ice, and the force of skidding balls can break the finger off. If the outer

finger of any circuit is broken, the balls in that circuit could be lost. Breakage of inner fingers result in balls being trapped between circuits and the failure of adjacent circuits can occur. The deflection yoke is a solid insert between circuits and outboard of the outer circuits. They are rugged enough to chip away ice in the ball groove. They also fill the space between circuits, thus eliminating the possibility of balls being trapped between circuits. If all balls should be lost from a ball nut equipped with deflectors, these yoke-type units will then cause the ball nut to function as a threaded nut. This is a true fail safe feature."

The line between puffing and warranting is often difficult to draw, but the more specific the statement the more likely it constitutes a warranty. J. White & R. Summers, *Uniform Commercial Code* 329 (1980). On the basis of the evidence in the record and resolving all facts and inferences in the light most favorable to Abex, we conclude that a rational jury could have found that GM made affirmations of fact or promises that both the three- and four-inch ball-screw assemblies equipped with yolk deflectors were fail-safe.

### C

■■■ We next must determine whether a rational jury could have found that GM's affirmations of fact or promises became part of the basis of the bargain for the sale of the ball-screw assemblies. UCC § 2–313 clearly contemplates that warranties made after the sale may become a basis of the bargain. Official Comment 7 to § 2–313 provides:

"The precise time when words of description or affirmation are made ... is not material. The sole question is whether the language ... [is] fairly to be regarded as a part of the contract. If language is used after the closing of the deal (as when the buyer when taking delivery asks and receives an additional assurance), the warranty becomes a modification, and need not be supported by consideration if it is otherwise reasonable and in order."

In *Bigelow v. Agway, Inc.*, 506 F.2d 551 (2d Cir.1974), the court considered whether a salesman's oral statements constituted a valid post-sale warranty modification. In *Bigelow* a farmer sued the manufacturer and distributor of a chemical used to treat hay before baling. Although most farmers will not bale hay with a moisture level higher than twenty to twenty-five percent, apparently the plaintiff was told that the chemical would safely permit the baling of hay with a higher moisture level. Two months after the sale and use of the chemical, defendant's salesman guaranteed that hay treated with the chemical was safe to bale even though it contained a moisture level of thirty-two to thirty-four percent. The farmer baled the hay, and the level of moisture resulted in a fire that destroyed his entire crop. Rejecting defendant's argument that the salesman's representation was not a basis of the bargain, the Second Circuit noted,

"Although defendants might conceivably contend that since [the salesman's] representations postdated the delivery of the [treatment] ... and therefore could not be the 'basis of the bargain' as required for recovery ..., it is undisputed that the [salesman's] visit ... was to promote the sale of the product. Thus, they might constitute an actionable modification of the warranty."

*Id.* at 555 n. 6. Similarly, in the case at bar a rational jury could have found that GM's post-sale representations about the safety of ball-screw assemblies with yolk deflectors were designed to promote future sales. This is especially true since GM sent Abex brochures discussing the safety features for distribution to Abex's customers.

GM argues, citing *Durbano Metals, Inc. v. A & K Railroad Materials, Inc.*, 574 P.2d 1159 (Utah 1978); *Terry v. Moore*, 448 P.2d 601 (Wyo.1968); and *Speed Fastners Inc. v. Newsom*, 382 F.2d 395 (10th Cir. 1967), that Abex must prove reliance on the express warranty in order to establish that the warranty was part of the basis of the bargain. Official Comment 3 to UCC § 2–313 states, "in actual practice affirmations of fact made by the seller ... are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement ...." We need not decide whether an express warranty may exist without reliance, *see* J. White & R. Summers, *Uniform Commercial Code* 333 (1980) ("Possibly for lack of any other meaningful standard, courts must employ the test of whether buyer relied on the affirmation of fact or promise ..."), because Abex presented sufficient evidence for a rational jury to find that Abex did rely on GM's

express warranty. Robert Saunders, Director of Research and Development and Technical Marketing for Abex, testified that he was not concerned about making safety modifications on Abex's existing stock of ball-screw assemblies because of GM's representations:

"Q. (by Abex's counsel) Did you feel it was necessary to either alter your existing stock or the ball screws out in the field with runout threads?

A. (by Mr. Saunders) No.

Q. Why not?

A. Because the design that we had, either the thread runout or—the washer was somewhat less critical because of the existence of the deflector yokes.

Q. All right. In other words, you weren't so concerned about the safety features because of the representations about the yoke deflectors?

A. That's correct."

R. IX, 42.

■ GM contends that Abex cannot recover for breach of express warranty because there was no mutual agreement to modify the limited written warranty as required by § 2–313. In *Cargill, Inc. v. Stafford*, 553 F.2d 1222, 1225 (10th Cir.1977), we noted that the UCC contains an objective test of mutuality of assent as "manifested by the conduct of the parties." On the basis of the evidence presented in this case, we hold that after resolving all factual inferences in favor of Abex, a rational jury could have found that both parties recognized and assented to a warranty on the absolute safety of ball-screw assemblies equipped with yolk deflectors.

### III

GM contends that its breach of the express warranty did not proximately cause Abex damage because the collapse of the Jetway had nothing to do with the failure of the yolk deflectors. However, since Abex presented evidence that the screw free-fell through the nut and that GM warranted that the yolk deflectors would engage the nut, we must resolve any doubts in favor of Abex.

REVERSED AND REMANDED for further proceedings consistent with this opinion.