**FUCHS SUGARS & SYRUPS, INC., and Francis J. Prael, doing business as Lewis & Company, Plaintiffs,**

v.

**AMSTAR CORPORATION, Defendant.**

No. 74 Civ. 2954.

United States District Court,
S. D. New York.

March 21, 1978.

---

7. 527 F.2d at 911.

9. See note 4, *supra*.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiffs; H. Richard Wachtel, Grant S. Lewis, Michael R. W. Green, William G. Primps, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant; William E. Willis, James H. Carter, Jr., William M. Dallas, Jr., Steven E. Harbour, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

At the end of a three-week trial involving 47 witnesses and hundreds of documents, a jury found that defendant Amstar Corporation ("Amstar") had violated § 1 of the Sherman Act, 15 U.S.C. § 1, and was liable to both plaintiffs, Fuchs Sugars & Syrups, Inc. ("Fuchs") and Francis J. Prael, doing business as Lewis & Company ("Prael"). Plaintiffs' claims arose out of Amstar's April 1, 1974 termination of general sugar brokers, including Fuchs and Prael, and the events leading up to the termination.[1] The jury awarded Fuchs $80,000 and Prael $70,000; each award will be trebled under § 4 of the Clayton Act, 15 U.S.C. § 15. Amstar now moves pursuant to Rule 50(b), Fed.R. Civ.P., for judgment notwithstanding the verdict on the grounds that:

(1) As a matter of law, plaintiffs failed to prove a combination or conspiracy;

(2) Plaintiffs failed to prove any causal link between the purported violation and injury allegedly sustained by plaintiffs;

(3) As a matter of law, § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), would be violated by plaintiffs' receipt of brokerage commissions, and as a matter of law, termination of brokerage commissions in order to avoid such violations is a complete defense to this purported Sherman Act § 1 violation.

Also pending is a fee application under 15 U.S.C. § 15 on behalf of counsel for plain-

---

1. The jury found Amstar not liable for attempted monopolization under § 2 of the Sherman Act, 15 U.S.C. § 2. In addition, the jury found against Amstar on the special question directed at its defense that the brokerage payments constituted violations of § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c). All other claims and counterclaims were withdrawn.

tiffs.[2] For the reasons hereinafter stated, defendant's motion for judgment notwithstanding the verdict is denied, and decision on the fee application is deferred until final determination of this case on appeal.

Amstar sells its sugar to three classes of customers: industrial purchasers such as candy, cookie and soda companies which purchase in bulk quantities approximately 75% to 80% of the refined sugar; grocery chains which purchase approximately 20% of the refined sugar; and institutional purchasers such as restaurants which purchase individual packets and other specialty items for consumption by their individual customers.

Prior to April 1, 1974, Amstar marketed its sugar to these customers in a number of ways, including use of general sugar brokers, direct sugar brokers and its own sales force. The sole distinction between general and direct sugar brokers is that general sugar brokers simultaneously represent more than one sugar refinery, while direct sugar brokers represent only one. Brokers do not take title to the sugar and do not buy and sell for their own accounts. Rather, they participate in the refiner's initial sale of sugar by functioning as go-betweens who bring together buyers and sellers at terms agreeable to both.[3] For this they are compensated by the refiner in the form of commissions for sales of the refiner's sugar. They are never compensated by the customers to whom the sugar is sold.

For one reason or another, Amstar was not pleased with the use of general sugar brokers as a means of distributing its product and so it decided to terminate them and replace them with direct brokers and Amstar sales people.[4] The questions for the jury were whether the terminations were the product of an anti-competitive purpose, whether they had an anti-competitive effect, and, if so, whether the plaintiffs were injured as a direct result of the antitrust violation.

Amstar argued to the jury that the terminations were motivated by many good business reasons. The jury, however, chose to reject Amstar's argument and to accept plaintiffs' explanation of why the general brokers had been terminated. The theory of plaintiffs' case was that Amstar had a multi-phase five-year plan for the control and eventual elimination of general sugar brokers. The plan culminated in the April 1, 1974 termination of general sugar brokers and their replacement by direct brokers and Amstar's own sales people. According to plaintiffs, this constituted an unreasonable restraint of trade in violation of § 1 of the Sherman Act because it was motivated not by the business reasons Amstar proffered, but by an anti-competitive purpose to suppress particularly price, but also non-price, competition among various brokers.

Amstar did not object to this Court's instruction allowing the jury to consider, in relation to the purpose and effect of the broker terminations, Amstar's activities leading up to and following the April 1, 1974 terminations. Nor does it now contend that it was error to have so charged. Similarly, Amstar does not appear to explicitly challenge the sufficiency of the evidence with respect to anti-competitive purpose or effect.

▆ The starting point of this Court's analysis must be a recognition that the standard for granting judgment notwithstanding the verdict is most stringent.

2. The Court denied from the bench plaintiffs' oral motions: for judgment notwithstanding the verdict or a new trial on the § 2 claim; for a directed verdict on pre-judgment damages on the § 1 claim and a new trial on the post-judgment damages on the § 1 claim; and for an injunction compelling Amstar to reinstate Fuchs and Prael as general sugar brokers.

3. Therefore, resale price maintenance was not an issue in this case.

4. In order to do so, additional direct brokers and sales people were needed. For this purpose, Amstar induced, for example, Kenneth L. Fox and George David Waller, to become direct brokers in the Midwest. In addition, Joseph Gavin, formerly a Fuchs vice president, joined Amstar after Fuchs was terminated in April of 1974 and thereafter called on customers previously serviced by Fuchs.

Simply stated, it is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached. [Furthermore] the evidence must be viewed in the light most favorable to the party against whom the motion is made and he must be given the benefit of all reasonable inferences which · may be drawn in his favor from that evidence.

*Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir. 1970); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2524 (1971). Moreover, the evidence which must be considered is not all the evidence, but only the evidence favorable to the non-moving party and the uncontradicted, unimpeached evidence unfavorable to the non-moving party, *Bigelow v. Agway, Inc.,* 506 F.2d 551, 554 (2d Cir. 1974); *Horowitz v. Anker,* 437 F.Supp. 495, 503 (E.D.N.Y.1977), at least to the extent that the latter comes from disinterested witnesses. Wright & Miller, *supra* § 2529 at 572–73. *But see Simblest v. Maynard, supra* at 5 n.3. And "[s]ince grant of one of these motions deprives the party of a determination of the facts by a jury, they should be cautiously and sparingly granted." Wright & Miller, *supra* § 2524 at 542. With these principles in mind, the Court now turns to a review of the evidence to determine whether or not there was sufficient proof to justify the jury's accepting plaintiffs' theory.

### FACTS

There was evidence in the record from which the jury could have found the following facts:

Sugar refining is, and was during the period in question, an oligopoly industry in which a limited number of smaller firms are dominated by Amstar, which markets Domino brand sugar. In the Northeastern United States, where plaintiffs transacted most of their business and which the parties agreed is a relevant submarket, over 80% of the refined sugar market, which the jury could have found to be the relevant product market, has been controlled by four firms. Of these four firms, Amstar has predominated, and had approximately 45% to 50% of the market share of sales of refined sugar in the Northeast in 1974.

Plaintiffs' contention that the elimination of the general sugar broker had an adverse effect on intrabrand and interbrand price and non-price competition turns on the peculiar status and function of the general broker. Based on the fact that brokers were compensated by the refiner, Amstar characterized general brokers as merely its agents. In doing so, however, it ignored the fact that inherent in the concept of simultaneous representation of multiple refiners is a disclosed conflict of interest between the "agents" and "principals". Thus, general sugar brokers by definition are independent of, and at times adverse to, the refiners they represent.

This inherent conflict between "agent" and multiple "principals" is intensified by the method of compensating brokers. Brokerage commissions generally are based upon volume, increasing in proportion to the volume of sugar sold and without regard to the sales price or profit margin to the refiner on the sale. Thus, the usual brokerage compensation scheme contains an incentive for the broker to sell as much sugar as possible, but no incentive for the broker to get the best possible price for his refiner. In fact, if there is any built-in incentive it is for the broker to seek as low a price as the market will bear so as to attract customers away from other brokers and the refiner's own sales people and induce those customers to buy in greater quantity.[5] Thus, there is another inherent conflict—between the refiners' interest in maximized profits and the brokers' interest in maximized sales regardless of the refin-

---

5. In 1972, Amstar attempted to alter these incentives by offering the general brokers a Bonus Incentive Plan under which those brokers who effected sales at list price received an additional 3 cents/cwt commission, while those who sold at off-list received the usual commission of 9½ cents/cwt.

ers' profit. Furthermore, because other re-finers generally compensate brokers in the same manner, the general broker concept contains no intrinsic incentive for the broker to sell the product of any particular principal.[6]

Because brokerage commissions were based on volume of sugar sold there was intense competition among brokers for high volume sales. However, because brokers had no discretion in negotiating price or other terms and no authority to bind the refiner, and were limited to relaying price quotations and other information back and forth from buyer to seller, they had to develop other means of distinguishing themselves so as to compete for more sales. What ensued was broker competition to provide additional services to sugar purchasers, such as distributing free price forecast sheets and other data on the market, or obtaining free or cheaper delivery of sugar, or locating cheaper, or "distress", sources of sugar or introducing cheaper "private label" brand sugar.[7] Most importantly, brokers often competed by "shopping" for the lowest price among the refiners they represented. For example, brokers would sometimes inform a small volume purchaser of the price quote that had been given to a larger volume purchaser and thereby force down the price the small purchaser would be willing to pay. Or the general broker, being privy to price quotes from other refiners, might tell Amstar or the prospective purchaser that Amstar's quote was higher than that of a rival refiner and then tell Amstar that it must meet the competitor's quote if it hoped to make the sale. In these ways the general broker created interbrand competition among refiners which had a downward effect on price. At the same time, there was intrabrand price competition between the general sugar broker who sought the most competitive price and the Amstar salesman who generally sought to sell at the list price. The existence of such intrabrand competition is supported by the testimony of Edwin O. Holtz, formerly of Southern Biscuit Co., Howard Tiekert, formerly of Bond Baking Company, and Terrance Webster of Sunshine Biscuit, Inc., who testified to the effect that they generally got lower prices from general brokers than they got from Amstar people or from direct brokers.

Another avenue of competition brought about by the general sugar brokers was the introduction of private label sugar to the New York metropolitan area grocery market. It was through the efforts of general brokers, particularly Czarnikow-Rionda, that grocery stores were given the opportunity to buy the less expensive private label brands and offer these alongside and in competition with the name brands.

There was evidence in the record to suggest that it was Amstar's displeasure with these pro-competitive activities of the general brokers that led to their termination. For example, Amstar had communicated to various general brokers on a number of occasions its displeasure with the general brokers' depressing effect on prices. In addition, Amstar documents demonstrate a concern with the destabilizing effect the general brokers had on prices. Furthermore, William P. Cleaver, Vice President of Amstar and President of the American Sugar Division of Amstar, testified in a deposition that the only dissatisfaction with general sugar brokers he remembers having been expressed by Mr. Shanley, Executive Vice President of the American Sugar Division and formerly Vice President of Industrial Sales, had to do with the detrimental impact the general brokers were having on the price Amstar was receiving. Mr. Cleaver did not recall Mr. Shanley's ever having mentioned in connection with his dissatis-

---

6. In practice, however, general brokers did develop loyalties, whether based on friendships with employees at a particular refinery, or on practicalities such as the desirability of offering or being in a position to offer the products of a dominant and diversified refiner such as Amstar.

7. Private label brands are owned by the sugar purchaser, such as a chain store, rather than by the refiner. An example of a private label brand is Ann Page, owned by A & P.

faction with the general brokers any of the business reasons which purportedly motivated Amstar to terminate the general brokers.

As further evidence of anti-competitive motive or purpose, there was the testimony of Ronald Blenderman, who had been Vice President of grocery products, from which the jury could have concluded that in order to protect the dominance of its name in the New York metropolitan grocery market, Amstar refused to sell its sugar for marketing under a private label. In addition, the jury could have found that in 1970 when Amstar terminated Czarnikow-Rionda, which at that time was Amstar's leading general sugar broker in the New York area, it did so because Czarnikow-Rionda was buying sugar from Puerto Rico, repackaging it and selling it to New York grocery stores as private label at a price substantially less than Amstar's Domino brand. Furthermore, the jury could have found that Amstar intended to restrain competition with the Domino brand in the New York metropolitan grocery market when in 1970 it terminated all but three of the remaining general brokers in the New York grocery market, when in 1971 it induced Susan Goodman, formerly a leading sales person with Czarnikow-Rionda, to join Fuchs, and when in July 1972 it induced Fuchs to become an exclusive broker in the grocery market along with Andorn, Bergida & Danks ("ABD"), a food broker who became a direct broker for Amstar and replaced the 16 or so general brokers terminated by Amstar in 1970.

Amstar also argued to the jury that the terminations did not have an anti-competitive effect.[8] The jury, however, was entitled to draw the contrary inference from plaintiffs' documentary evidence that Amstar's market shares in the Northeast increased dramatically between the end of 1973 and the end of 1974, and that in 1975 Amstar reported the highest net income in its history despite the change-over in 1974 to the "lifo" method of reporting income.

From this the jury could have inferred that the termination of all general brokers, not just plaintiffs, had an anti-competitive impact on the Northeast geographic submarket. In addition, the jury could have found, on the basis of the testimony of Dennis J. O'Connell, President of Ambrosia Chocolate Company and Hooton Chocolate Company, subsidiaries of W. R. Grace & Co., that subsequent to the terminations Amstar began a practice of offering long term requirements contracts. He also testified that Amstar had attempted to force him to sign a one-year contract for almost a year's requirements of sugar. Joseph Torter of M. Polaner & Son, Inc., testified similarly. Under such contracts, the customer bears the risk of a rise in the price of raw sugar; Amstar assumes no risk. Mr. Shanley of Amstar testified that in the past, prior to the April 1, 1974 termination of the general sugar brokers, it had offered contracts with a minimum, maximum and specified period, and had offered 90 day coverage at a fixed price, but these had not been successful. Only in 1974, after the general brokers had been terminated, did Amstar succeed in convincing customers to tie up their requirements, to the possible detriment of competing refiners and customers.

In sum, the jury was entitled to conclude that the terminations and events leading up to and following the terminations had the anticompetitive purpose and effect of eliminating intrabrand price competition, depressing interbrand price competition and enhancing Amstar's dominant position in the market such that, for example, Amstar could now for the first time impose on its customers long term (six months or a year) requirements contracts under which the customer bore the risk of loss.

## AMSTAR'S GROUNDS FOR JUDGMENT NOTWITHSTANDING THE VERDICT

### I. *No Combination or Conspiracy*

It is hornbook law that a manufacturer, or in this case a refiner, has the right to

---

**8.** The Court notes that anti-competitive impact is judged in terms of a relevant market, not in terms of the adverse effects, if any, on the terminated brokers. *See Burdett Sound, Inc. v.* *Altec Corp.,* 515 F.2d 1245, 1248 (5th Cir. 1975); *Bushie v. Stenocord Corp.,* 460 F.2d 116, 119–20 (9th Cir. 1972).

unilaterally choose the customers with whom he will deal. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). However, the post-*Colgate* Supreme Court decisions, most notably, *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), and *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968),[9] have read *Colgate* as narrowly as possible, leading many to question to what extent *Colgate* has any continued application. *See, e. g., Greene v. General Foods Corporation*, 517 F.2d 635, 651–55 (5th Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976); *George W. Warner & Co. v. Black & Decker Mfg. Co.*, 277 F.2d 787, 790 (2d Cir. 1960) ("The Supreme Court [in *Parke, Davis*] has left a narrow [*Colgate*] channel through which a manufacturer may pass even though the facts would have to be of such Doric simplicity as to be somewhat rare in this day of complex business enterprise."); Handler, Through The Antitrust Looking Glass—Twenty-First Annual Antitrust Review, 57 *Calif.L.Rev.* 182, 187–91 (1969); Pitofsky, Is the Colgate Doctrine Dead?, 37 *Antitrust L.J.* 772 (1968); The Supreme Court, 1967 Term, 82 *Harv.L. Rev.* 63, 259 (1968). *See also Tamaron Distributing Corporation v. Weiner*, 418 F.2d 137 (7th Cir. 1969).

It was primarily on the basis of the facts, reasoning and broad dicta in *Albrecht, supra*, that this Court denied Amstar's motion for a directed verdict on the grounds of no combination or conspiracy. There, the Supreme Court found as a matter of law a combination between the defendant and two third parties, one of whom had a purpose entirely different from the defendant's purpose and the other of whom had a purpose antithetical to the achievement of defendant's purpose. 390 U.S. at 149–50, 88 S.Ct. 869. By implication, what the Court held was required to establish such a combination was an anti-competitive purpose on the part of the defendant and a material aiding and abetting of that purpose by third parties having knowledge of the purpose, even though the third parties did not specifically intend to advance defendant's purpose.

Under this holding, so long as the jury in the instant case found an anti-competitive purpose, which they could have, they also could have found that Amstar combined with Kenneth L. Fox and George David Waller in pursuit of that purpose.[10] Amstar knew that in order for its plan to succeed it would need to hire additional people to serve as either direct brokers or Amstar sales people. There was evidence that it expected at least one of these additional people to "fall out" of the ranks of the terminated general brokers. Fox and Waller did not merely "fall out", however. They were induced by Amstar to give up representing competing refiners, and they agreed to do so, knowing the nature of Amstar's dissatisfaction with the general sugar brokers and what would be expected of them as direct sugar brokers. When Fox and Waller fell in line, they provided the experience Amstar required and thus materially aided and abetted the overall plan.

In addition, if the jury found an anti-competitive purpose in the elimination of general brokers with respect to New York City grocery accounts and the imposition of exclusive brokerage arrangements involving territorial and customer restrictions with Fuchs and ABD, under the *Albrecht* holding the jury could also have found that Amstar combined with ABD in order to

**9.** *See also United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 378, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), *overruled in part on other grounds*, *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

**10.** Although whether the general brokers were "agents" is an issue with respect to the Robinson-Patman defense and is an implicit issue with respect to whether Amstar's attempts to control them was illegal under § 1 of the Sherman Act, it is not an issue with respect to whether or not they were capable of combining or conspiring. In other words, Amstar does not contend, and rightly, that the general brokers lacked sufficient independence such that any conspiracy with them would have been intra-corporate. *See Tamaron Distributing Corp. v. Weiner, supra*, 418 F.2d at 139.

reduce interbrand competition, stabilize prices, and eliminate general brokers servicing New York City grocery accounts.

Furthermore, in the famous footnote 6 in *Albrecht*, the Supreme Court outlined three other possible combinations:

Under *Parke, Davis* [plaintiff] could have claimed a combination between [defendant] and himself, at least as of the day he unwillingly complied with [defendant's] advertised price. Likewise, he might successfully have claimed that [defendant] had combined with other carriers [plaintiff's competitors] because the firmly enforced price policy applied to all carriers, most of whom acquiesced in it. See *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 372 [87 S.Ct. 1856, 1862, 18 L.Ed.2d 1249] (1967). . . .

[Plaintiff's] amended complaint did allege a combination between [defendant] and [plaintiff's] customers. Because of our disposition of this case it is unnecessary to pass on this claim. It was not, however, a frivolous contention.

Under the first of these alternatives, both of which were approved in *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 142, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the jury could have found that Amstar combined with Fuchs who unwillingly complied with territorial and customer restrictions intended to suppress competition with the Domino brand in the New York City grocery market. Under the first and second alternatives posed in footnote 6 of *Albrecht*, the jury might have found a combination with the thirteen terminated general brokers who agreed to accept the termination payments offered by Amstar.

Amstar urges, however, that there could be no unlawful combination or conspiracy unless the terminations were for the purpose of coercing future compliance with an illegal plan. The thrust of this argument is that since Amstar terminated all, rather than selective, general brokers and the terminations were final, there was no element

of coercing future compliance. This argument has superficial appeal, but falters under closer scrutiny. First, even assuming that coercion is required in termination cases, contrary to Amstar's view of the case there was proof from which the jury could have inferred coercion. Over an extended period of time Amstar had used threats, selective terminations and territorial and customer restrictions to control general brokers. Then, simultaneously with announcing the termination of the remaining general brokers, but prior to the effective date of the terminations, Amstar offered Fox and Waller the position of direct brokers, but told them they must decide almost immediately. Fox and Waller knew that if they declined the offer they would be terminated entirely by Amstar. Under all these circumstances the jury could have found that Fox and Waller were coerced into acquiescing.

■ Second, Amstar's argument rests on the assumption that the terminations were merely a complete change-over in distribution. *If* all that were involved were a mere change-over in vertical distribution, with no anti-competitive purpose or effect, then Amstar is correct that there could not have been a combination or conspiracy in illegal restraint of trade, for as the Second Circuit recently pronounced:

Where a manufacturer *simply* decides on his own to substitute one dealer for another, and cuts off the former dealer, his decision to sell exclusively to a new dealer does not amount to an antitrust "conspiracy" with the latter, . . . even though the manufacturer has agreed with the new dealer to transfer patronage to him and to terminate sales to the former dealer.

*Bowen v. New York News, Inc.*, 522 F.2d 1242, 1254 (2d Cir. 1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976) (emphasis added, citations omitted).[11] However

[A manufacturer] may "franchise" certain dealers to whom, alone, he will sell his goods. Cf. *United States v. Colgate & Co.*, 250 U.S.

---

11. Bowen relied on the often quoted language from Schwinn:

[t]he critical inquiry in such "refusal to deal" cases is not whether there was a refusal to deal, or whether a refusal to deal was carried out by agreement with others, but rather whether the refusal to deal, manifested by a combination or conspiracy, is so anticompetitive, in purpose or effect, or both, as to be an unreasonable restraint of trade. *Hawaiian Oke,* [416 F.2d] supra, at 77–78; *Walker Distributing Co. v. Lucky Lager Brewing Co.,* 323 F.2d 1, 7 (9th Cir. 1963). This inquiry is primarily a factual one, and its resolution often requires determination of motive or intent.

*Alpha Distributing Co. of Calif., Inc. v. Jack Daniel Distillery,* 454 F.2d 442, 452 (9th Cir. 1972), *cert. denied,* 419 U.S. 842, 95 S.Ct. 74, 42 L.Ed.2d 70 (1974).[12] The question, then, is whether reasonable men could only conclude that Amstar *simply* substituted direct brokers and its own sales force for the terminated general brokers, or *simply* vertically confined its product, as Amstar chooses to characterize the facts; or could reasonable men have concluded that the terminations were a means of effectuating a broader anti-competitive purpose and in fact had an anti-competitive effect. Viewing the evidence in the light most favorable to plaintiffs and giving plaintiffs the benefit of all reasonable inferences to be drawn therefrom, the Court concludes that the jury could reasonably have found an anti-competitive purpose and effect and therefore could have found an illegal combination or conspiracy.[13] Accordingly, the numerous cases cited by Amstar, which went off not on the absence of agreement but on the absence of anti-competitive motive or effect, are inapposite.[14]

300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). If the restraint stops at that point—*if* nothing more is involved than vertical "confinement" of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act.
*United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 376, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), *overruled in part on other grounds, Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (emphasis added).

**12.** Amstar has contended that this is not a refusal to deal case at all, as it has never refused to sell sugar to plaintiffs but has merely refused to compensate them for arranging sales of Amstar's sugar. It would seem that a refusal to deal must be a function of the capacity in which the parties dealt prior to the termination. Therefore, inasmuch as Amstar had never dealt with plaintiffs as sugar purchasers, it is not significant that Amstar has never refused to sell sugar to plaintiffs.

**13.** In connection with refusals to deal the courts have found to be "arrangements restraining trade" such practices as refusals to deal to eliminate price-cutting dealers, *United States v. Parke, Davis & Co.,* [362 U.S. 29, [80 S.Ct. 503, 4 L.Ed.2d 505] (1960)]; *Klor's v. Broadway-Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1958); to keep new competition out of a market, *Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); to enforce a tying arrangement, *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir. 1964); to create a monopoly in a product market, *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), or to further strengthen an already dominant market position. *Eastman Kodak v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

*Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9th Cir. 1972).

**14.** *E. g., Burdett Sound, Inc. v. Altec Corp., supra,* 515 F.2d at 1248 (agreement, but no anti-competitive intent or effect); *Bushie v. Stenocord Corp., supra,* 460 F.2d at 120 (proof of and concession of agreement, but lack of anti-competitive purpose); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 78 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (went off not on lack of agreement but on lack of any evidence of anti-competitive motive for terminating and lack of proof of anti-competitive practices); *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963) (went off on lack of anti-competitive motive or effect, not on lack of conspiracy).

Amstar compares its offering some of the terminated general brokers positions as direct brokers to the situation in Bowen, *supra,* where the Second Circuit upheld a newspaper publisher's offering a franchise to some but not all of the independent carriers it was terminating. Amstar's reliance on Bowen is misplaced, however, inasmuch as Bowen did not go off on the absence of combination or conspiracy, but on the absence of an anti-competitive purpose and effect. *Id.* at 1252–53, 1254. The Court reasoned that when the defendant substituted ex-

## II. *No Causal Connection Between Violation and Injury Sustained By Plaintiffs*

The thrust of this argument seems to be that: the combination, if any, was between Amstar and two of its Midwestern general brokers (Fox and Waller) who agreed to become direct brokers; this combination could not have injured plaintiffs inasmuch as plaintiffs did not compete in the Midwest; in the Northeast where plaintiffs do compete, and where their injury, if any, would have occurred, the general brokers were replaced by Amstar employees; because, as a matter of law, Amstar and its employees could not constitute a combination, plaintiffs were not harmed by any combination.

There are a number of flaws in this argument. First, there is evidence in the record that as an Amstar direct broker Fox called on RKO Bottlers, an account upon which Prael was calling on behalf of Sucrest, and that Waller had national accounts throughout the United States whereby he competed with all brokers selling on a national basis, including Fuchs and Prael. From this the jury could have inferred that some of the business plaintiffs lost was due to direct competition from Fox and Waller. Second, just as the terminations could not be viewed in isolation from what motivated them and resulted from them, so too the combinations cannot be viewed in isolation from the *overall* plan they facilitated. In order for the plan to succeed, Amstar had to be able to replace the general brokers with experienced substitutes. Fox and Waller, in providing experience, materially aided and abetted the *overall plan*. Therefore, if the overall plan injured plaintiffs and Fox and Waller contributed to the success of the plan, then Fox and Waller contributed to plaintiffs' injury. Third, as discussed *supra*, Fox and Waller were not the only possible members of a combination or conspiracy. Fourth, the Court is of the view that the causal connection must be between plaintiffs' injury and the antitrust violation, rather than between plaintiffs' injury and the combination. *Billy Baxter, Inc. v. Coca Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). Thus, the question is whether there is a causal connection between plaintiffs' injury and the illegal restraint of trade, namely, suppression of price competition, attempted price stabilization and enhancement of Amstar's power to control the movement of sugar within the market generally.

It should first be noted that plaintiffs introduced sufficient evidence through their expert, Peter Max, whereby the jury could have found that plaintiffs lost business and therefore were injured by virtue of the termination of their representation of Amstar.

■ Amstar appears to contest plaintiffs' standing to assert this injury, however, relying on *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); *Billy Baxter, Inc. v. Coca-Cola Co.*, supra, 431 F.2d 183, and *Productive Inventions, Inc. v. Trico Products Corp.*, 224 F.2d 678 (2d Cir. 1955), *cert. denied*, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956). The plaintiffs in those cases were not within the "target area" because their injury was derivative of the injury to the target. By contrast, because Fuchs and Prael were deliberately selected by Amstar as the means to the end restraint and they were harmed as a result, their injury was not derivative

---

clusive franchisees for independent carriers who had previously sold not only defendant's newspapers but those of its competitors the substitution was not motivated by and would not have the effect of eliminating competition from other newspapers inasmuch as it was contemplated that the franchisees would sell, rather than abandon, their independent routes. *Id.* at 1254. The instant case is directly to the contrary: the very purpose of inviting general brokers to become direct brokers was to prevent them from representing competing refiners.

Amstar's reliance on *Oreck Corp. v. Whirlpool Corp.*, 563 F.2d 54, 58 (2d Cir. 1977), is entirely misplaced as the narrow holding of that case—that it was plain error to have in effect charged a *per se* rule in instructing the jury that the facts, if found to be true, would constitute a violation—has no application to this case.

of the injury to Amstar's competitors or customers; in fact, the injury to Amstar's competitors and customers in a sense was derivative of the harm caused plaintiffs by the four-phase plan to control and ultimately terminate all the general sugar brokers. Accordingly, plaintiffs were within the target area and therefore have standing. *See Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90, 100 (3d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977); *cf. International Railways of Central America v. United Brands Co.*, 358 F.Supp. 1363, 1370, 1372, 1373 (S.D.N.Y. 1973), *aff'd on other grounds*, 532 F.2d 231 (2d Cir. 1976). *See generally* Berger & Bernstein, An Analytical Framework for Antitrust Standing, 86 *Yale L. J.* 809 (1977).

██ Similarly, the Court believes that plaintiffs proved there was a causal connection between the injury and the antitrust violation: the terminations facilitated the anti-competitive restraint and therefore were part of the violation; the terminations injured plaintiffs; therefore, plaintiffs' injury was causally related to the violation.

Nonetheless, Amstar argues that the recent Supreme Court decisions of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) and *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) require judgment in its favor. The Court believes only the latter to be relevant.

*Brunswick* held

> that for plaintiffs to recover treble damages on account of § 7 violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

429 U.S. at 489, 97 S.Ct. at 697, *quoting Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (emphasis in original). Put simply, private plaintiffs in § 7 suits must prove not merely that their "loss occurred 'by reason of' the unlawful acquisitions [but rather that it occurred] 'by reason of' that which made the acquisitions unlawful." *Id.* 429 U.S. at 488, 97 S.Ct. at 697. Assuming that *Brunswick* applies in a § 1 suit, *but see* Handler, Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977, 77 *Colum.L. Rev.* 979, 992 n.76 (1977), by a parity of reasoning Fuchs and Prael would have to prove not merely that their injury occurred by reason of their termination, but that it occurred by reason of that which made the terminations unlawful. What made the terminations unlawful was that the purpose and effect of the overall plan which culminated in the terminations was to enhance Amstar's power over the price and movement of sugar in the market generally by restricting the general broker's ability to compete. In the case of those who went along with the plan, *e. g.*, ABD, Fox and Waller, the purpose was achieved by their giving up the right to handle directly competitive lines and exert downward pressure on prices. In the case of plaintiffs, who ultimately refused to go along, the purpose was achieved by their being rendered less effective by their inability to offer Amstar products. Because Amstar is the industry giant, particularly in the Northeast where plaintiffs' efforts are concentrated, and because Amstar offers a wide variety of specialty items not available from other refiners and is a large reliable source of supply, the ability to offer Amstar products in addition to those of other refiners has a "door-opener" effect. Conversely, there was ample proof that because plaintiffs cannot offer Amstar products along with other refiners' products they have been foreclosed from competing for certain customers' accounts. *See Greene v. General Foods Corp., supra,* 517 F.2d at 664. Thus, plaintiffs' injury was causally connected to that which made the terminations unlawful.

III. *Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), Would be Violated by Plaintiffs' Receipt of Brokerage Commissions; Therefore, Termination of Brokerage Commissions in Order to Avoid Such a Violation is a Complete Defense to Plaintiffs' Claimed Sherman Act § 1 Violation*

■ Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein *where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.* (emphasis added).

For purposes of its Robinson-Patman defense, Amstar contends that the general sugar brokers were in fact buyers' agents and therefore it violated § 2(c) for the refiners to pay and the brokers to accept compensation.[15] It follows, Amstar contends, that Amstar could not be found liable under the Sherman Act for terminating a practice which violated § 2(c) of Robinson-Patman; therefore, the existence of a § 2(c) violation was a complete defense to the finding of a § 1 violation.

In asserting that plaintiffs were "in fact" acting on behalf of sugar purchasers, Amstar does not suggest that plaintiffs were not its agents. Rather, its position is that because plaintiffs at times made recommendations which were in the best interest of the customers they were in fact acting on behalf of such customers and must have been acting adversely to the interests of Amstar, making them unfaithful Amstar agents. The only difficulty with this position is that, contrary to Amstar's protestations, the question of whether plaintiffs acted primarily, as opposed to incidentally, for the benefit of customers is factual and was for the jury to decide.[16] The jury resolved

---

**15.** In connection with Amstar's Robinson-Patman defense, the jury was charged in pertinent part as follows:

This provision of the Robinson-Patman Act prohibits compensation by a seller to an agent, representative or other intermediary, if that agent is in fact acting on behalf of the purchaser.

Now, merely because that agent provides incidental or supplementary services for the purchaser, such as tracking orders, placing orders, providing sales information and the like, does not mean that the agent is acting on behalf of the purchaser. So, if that is all that you find these plaintiffs did for purchasers, then it was legal for the seller, defendant, Amstar to pay them brokerage. However, if you find, by a preponderance of the evidence, that either or both plaintiffs in this case were acting primarily for the benefit of purchasers in attempting to reduce the price of sugar, rather than primarily for their own benefit in securing commissions, or primarily for the benefit of Amstar in securing the sale of Amstar's sugar, then you must find that that plaintiff or both plaintiffs in this action have violated the Robinson-Patman Act. Amstar objected to the insertion of the words "rather than primarily for their own benefit in securing commissions."

**16.** Amstar urged that whether plaintiffs were in fact acting on behalf of customers was a question of law which must be resolved in its favor on the basis of certain inferences that could be drawn from Stipulations of Fact 18, 22, 35, 36, 37, and 39. Suffice it to say that these stipulations are susceptible of more than one inference and therefore the question was properly left to the jury.

Amstar also cited portions of the Federal Trade Commission's Trade Practice Rules for the Fresh Fruit and Vegetable Industry, 16 C.F.R. §§ 74 *et seq.*, as indicative of how the issue must be resolved. Even assuming that rules formulated on the basis of practices within the fruit and vegetable industry would have application to the sugar industry where practices, such as brokerage always being paid by the refiner, may be different, these rules merely set forth guidelines, not determinants. The rules themselves emphasize that

[i]n determining whether a broker acts for a buyer or a seller, each transaction must be considered on its own facts. A rule of general applicability can be helpful only in clarifying the pertinent legal principles and affording guidance to industry members in the application of these principles to particular situations. 16 C.F.R. § 74.2(c)(1)(ii)(*c*) *Example No. 2.*

this issue against Amstar [17] and that finding will not be disturbed inasmuch as there was ample evidence from which the jury could have inferred that plaintiffs were in fact acting primarily either for the sellers or for themselves.[18] If they found that plaintiffs acted primarily for the seller, then, as a matter of law, there could not possibly have been a § 2(c) violation. Whether there was a violation if the jury found that plaintiffs acted primarily for themselves, rather than for either the buyer or seller, is a question of law the Court will now explore.[19]

Amstar relies on *Great Atlantic & Pacific Tea Co. v. FTC*, 106 F.2d 667, 674–75 (3d Cir. 1939), *aff'g*, 26 F.T.C. 486 (1938), *cert. denied*, 308 U.S. 625, 60 S.Ct. 380, 84 L.Ed. 521 (1940), and *Quality Bakers of America v. FTC*, 114 F.2d 393, 399 (1st Cir. 1940), which contain language to the effect that under § 2(c) of Robinson-Patman a broker cannot be a dual agent of a buyer and a seller, or, more accurately, cannot be a true intermediary who acts in his own best interest in securing commissions by consummating as many sales as possible and in so doing benefits both the buyer and the seller. However, in both cases the language is dictum, the facts are distinguishable and these precedents would not otherwise be controlling in any event. Moreover, there is recent authority to the contrary,[20] and the question has been left open in this Circuit.[21] For these reasons, the Court deems it appropriate to approach the issue anew, in light of the purpose of § 2(c) and the abuses at which it was directed.

"The Robinson-Patman Act was enacted in 1936 to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." *FTC v. Henry Broch & Co.*, 363 U.S. 166, 168, 80 S.Ct. 1158, 1160, 4 L.Ed.2d 1124 (1960). *See generally* Fulda, Food Distribution in the

---

**17.** The jury was asked:

> Do you find by a preponderance of the evidence that either plaintiff Fuchs Sugars & Syrups or plaintiff Francis J. Prael, doing business as Lewis & Company, or both, acted primarily for the benefit of purchasers in attempting to reduce the price of sugar rather than primarily for their own benefit in securing commissions, or primarily for the benefit of Amstar in securing the sale of Amstar sugar?

The answer was negative as to both Fuchs and Prael.

**18.** The jury was entitled to take into account that Amstar knew that the marketing system it used (simultaneous representation of multiple refiners and compensation based on volume of sugar sold) was structured in accordance with the general broker's self-interest. Therefore, Amstar knew that the system dictated that the broker would be inherently adverse to the refiner and would have no inherent incentive to owe allegiance to any particular refiner. Based on this the jury could have found that the plaintiff general brokers were not merely agents of the multiple refiners they served, but were in fact intermediaries pursuing their own interest to the benefit of buyers and sellers and to the detriment of neither. *See In re Food Fair Stores, Inc.*, 83 F.T.C. 1213, 1227 (1973) (decision of administrative law judge), *modified* [1973–1976] Trade Reg.Rep. (CCH) ' 20,519 (F.T.C.1974) (affirmed administrative law judge finding based on admission of complaint counsel that evidence complaint counsel intended to offer would not support finding that broker

was acting for buyer). Moreover, there was other evidence to support a finding that plaintiffs did not favor the purchaser's interest over the seller's interest. For example, one of Amstar's own witnesses, Martin William Goldberg, Director of Grocery Purchasing for Wakefern Food Corporation, testified in answer to written interrogatories that "In our judgment, no sugar brokers acted specifically in our interests at any time."

**19.** Amstar contends that the charge and special jury question on this point purportedly made plaintiffs' motive relevant and that this was error inasmuch as there is nothing in the language or history of § 2(c) to suggest that motive is a factor. The Court is of the opinion, however, that when it in effect asked the jury to distinguish between a buyer's agent, seller's agent or intermediary it was merely instructing the jury to look at the totality of the circumstances and base its finding with respect to plaintiffs' function and status on the realities of the situation.

**20.** *In re Food Fair Stores, Inc., supra* at 1225–28; *Tillie Lewis Foods, Inc. v. Flotill Products, Inc.*, 65 F.T.C. 1099, 1111, 1114 (1963), *aff'd*, 65 F.T.C. 1131 (1964).

**21.** *See FTC v. Herzog*, 150 F.2d 450, 451 (2d Cir. 1945); *Biddle Purchasing Co. v. FTC*, 96 F.2d 687, 691 (2d Cir.), *cert. denied*, 305 U.S. 634, 59 S.Ct. 101, 83 L.Ed. 407 (1938).

United States, the Struggle Between Independents and Chains, 99 *U.Pa.L.Rev.* 1051 (1951). The chief devices employed by large buyers to coerce secret price concessions were "to demand the allowance of brokerage direct to them upon their purchases, or its payment to an employee, agent, or corporate subsidiary whom they set up in the guise of a broker, and through whom they demand that sales to them be made." *Great Atlantic & Pacific Tea Co., supra,* 26 F.T.C. at 503, 504, *quoting* Sen. Rep. No. 1502, 74th Cong., 2d Sess. at 7 and H.R.Rep. No. 2287, 74th Cong., 2d Sess. at 14. In other words, the primary concern of § 2(c) was the large buyer's use of "discounts in lieu of brokerage" and "dummy brokerage." *Henry Broch & Co., supra,* 363 U.S. at 169, 80 S.Ct. 1158; *In re Borman Food Stores, Inc.,* 81 F.T.C. 201, 207 (1972) (Elman, Comm'r, dissenting from issuing complaint) (*Food Fair* case); Calvani, Functional Discounts Under the Robinson-Patman Act, 17 *B.C.Ind. & Comm.L.Rev.* 543, 557 (1976); Schiering, The Robinson-Patman Act: Is Section 2(c) Back?, 26 *Case Wes.Res.L.Rev.* 594, 597 (1976). Accordingly, most § 2(c) cases, including the majority of the cases relied upon by Amstar,[22] involved these abuses. Inasmuch as these abuses are not involved here, this line of precedent is distinguishable.

There is legislative history, however, which indicates some passing concern with preventing abuses of the fiduciary relationship between broker and client. Sen.Rep. No. 1502, 74th Cong., 2d Sess., at 7 states:

Among the prevalent modes of discrimination at which this bill is directed, is the practice of certain large buyers to demand the allowance of brokerage direct to them upon their purchases, or its payment to an employee, agent, or corporate subsidiary whom they set up in the guise of a broker, and through whom they demand that sales to them be made. Whether employed by the buyer in good faith to find a source of supply, or by the seller to find a market, the broker so employed discharges a sound economic function and is entitled to appropriate compensation by the one in whose interest he so serves. But to permit its payment or allowance *where no such service is rendered,* where in fact, if a "broker," so labeled, enters the picture at all, it is one whom the buyer points out to the seller, rather than one who brings the buyer to the seller, is but to permit the corruption of this function *to the purposes of competitive discrimination.* The relation of the broker to his client is a fiduciary one. To collect from a client for services rendered in the interest of a party adverse to him, is a violation of that relationship; and to protect those who deal in the streams of commerce against breaches of faith in its relations of trust, is to foster confidence in its processes and promote its wholesomeness and volume. (emphasis added).

H.R.Rep. No. 2287, 74th Cong., 2d Sess., at 14 states:

**22.** In *Great Atlantic & Pacific Tea Co., supra,* the brokers were agents of the buyer, rendered no services to the seller, and the unearned commissions paid them by the seller were passed on to the buyer as a "quantity discount." In *Quality Bakers of America, supra,* the seller paid brokerage to a corporation owned by and acting for the buyer. This buyer's agent did not actually render service to the seller and most of the unearned commissions were indirectly passed on to the buyer. In *Biddle Purchasing Co. v. FTC,* 96 F.2d 687 (2d Cir.) *cert. denied,* 305 U.S. 634, 59 S.Ct. 101, 83 L.Ed. 407 (1938), which did not resolve the legality of one party's compensating an intermediary broker, the seller paid a broker under the buyer's control and acting as the buyer's agent, knowing that the commissions would be paid over to the buyer, thus giving the buyer a

discount. In *FTC v. Herzog,* 150 F.2d 450 (2d Cir. 1945), which again left open the question of the legality of compensating an intermediary, the brokers admitted in their answer that they acted as agents for fur garment retailers (buyers), they placed orders with manufacturers "at 'the most advantageous price from the standpoint of the buyer,' [and] . . . other competitive retailers . . . 'under[went] buying expense by maintaining buying offices, retain[ing] the services of . . . "fee" buyers, or send[ing] representatives to New York City to make fur garment purchases.' This result[ed] in a price discrimination in favor of the retailers who [did] business with the [brokers] . . . ." *Id.* at 452. *FTC v. Henry Broch & Co., supra,* likewise involved what the Court found to be an allowance in lieu of brokerage.

[This section] deals with the abuse of the brokerage function *for purposes of oppressive discrimination*. . . . [T]he positions of buyer and seller are by nature adverse, and it is a contradiction in terms incompatible with his natural function for an intermediary to claim to be rendering services for the seller when he is acting in fact for or under the control of the buyer, and no seller can be expected to pay such an intermediary so controlled for such services *unless compelled to do so by coercive influences in compromise of his natural interest.* (emphasis added).

It is apparent from reading this legislative history in context, that in enacting § 2(c) Congress was not motivated by an abstract concern for protecting or regulating the fiduciary relationship between broker and client. Rather, the concern with the perversion of the fiduciary relationship was incidental to the related, primary objective of eliminating price discrimination caused by oppressive tactics of large buyers who abused the brokerage function. However, there is dictum in *FTC v. Broch & Co.,* supra, 363 U.S. at 169–70 n.6, 80 S.Ct. at 1161, stating that "although not mentioned in the Committee Reports, the debates on the bill show clearly that § 2(c) was intended to proscribe other practices such as the 'bribing' of a seller's broker by the buyer. See 80 Cong.Rec. 7759–7760, 8111–8112."

Based on the above-quoted committee reports and the dictum in *Broch,* it has been held that § 2(c) covers commercial bribery "where [the] violation has an anti-competitive effect," *Grace v. E. J. Kozin Co.,* 538 F.2d 170, 173 (7th Cir. 1976), or "[gives] one seller a grossly unfair advantage over a competing seller," *Rangen, Inc. v. Sterling Nelson & Sons,* 351 F.2d 851, 857 (9th Cir. 1965), *cert. denied,* 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966). These cases followed the landmark case of *Fitch v. Kentucky-Tennessee Light & Power Co.,* 136 F.2d 12 (6th Cir. 1943), which outlawed such payments as "an unfair trade practice, . . obviously result[ing] in lessening competition." *Id.* at 16.

Because commercial bribery has an anti-competitive impact analogous to the discriminatory effect of dummy brokerage and other secret price concessions with which § 2(c) is primarily concerned, *cf. Grace v. E. J. Kozin Co., supra,* 538 F.2d at 174, these commercial bribery cases are reconcilable with the purpose of § 2(c). However, they are inapposite inasmuch as the jury in the instant case impliedly found that Amstar's compensating the general brokers had a pro-competitive effect. More importantly, they are inapposite because none of these cases involved a true intermediary [23]—one who is *not* "acting in fact for or in behalf" of the other party to the transaction,[24] as the jury could have found these plaintiffs to be.[25] On the contrary, each of these cases involved a fiduciary who committed a classic breach of faith in acting "for his own pocket," *Fitch, supra,* 136 F.2d at 15.

Amstar attempts to fit within the ambit of these commercial bribery cases by characterizing the general brokers as "faithless

---

**23.** Although *Rangen, supra,* denominated the malefactor (Grimes) in that case as "other intermediary," it was for lack of a better description, since Grimes did not fit precisely into the category of "agent" or "representative." It is clear on the facts that Grimes was not an intermediary in the true sense of the word. See 351 F.2d at 862.

**24.** The *Fitch* court observed that the " 'acting in fact for or in behalf, or . . . subject to the direct or indirect control' " language in § 2(c) modifies only intermediaries, not representatives or agents of buyers.

"The qualifying words were used for the purpose of excluding from the act legitimate brokerage, which is is [sic] no wise [sic] con-

demned by the act. *Since a broker would be an 'intermediary', legitimate brokerage would be included and made illegal unless such qualifying words were used. The act catches such intermediaries as are acting for the buyer or under the buyer's control,* without being an agent or representative in the legal sense of the word."

136 F.2d at 15, *quoting the opinion below,* 37 F.Supp. 728, 734 (W.D.Ky.1941) (emphasis added). The implication of this passage is that not all intermediaries act for or are under the control of buyers; therefore, compensation of an intermediary is not *per se* a violation.

**25.** See notes 17 and 18, *supra,* and accompanying text.

agents." However, the Court believes that this characterization is superficial and the jury was warranted in rejecting it for the same reasons that the jury was entitled to find plaintiffs to be intermediaries: Amstar knew that plaintiffs, unlike ordinary agents, were acting in their own self-interest and that this interest did not always accord with the interests of Amstar or any other refiner or, for that matter, the purchaser. Thus, neither Fuchs nor Prael, as general sugar brokers, could fairly be regarded as a pure fiduciary such as Fitch. *See Fitch v. Kentucky-Tennessee Light & Power Co., supra.* At the same time, the pursuit of plaintiffs' self-interest did not necessitate their being actually adverse to either side of the transaction. Therefore, to the extent that there was a conflict between plaintiffs and Amstar, it certainly was not comparable to a breach of trust such as that committed by Fitch.

For the foregoing reasons, and inasmuch as the commissions paid Fuchs and Prael were for services actually rendered, the Court does not perceive any policy reason why § 2(c) should proscribe a true intermediary's being compensated by one of the parties benefitting from the intermediary's services.[26] Therefore, the Court holds that as a matter of law § 2(c) of the Robinson-Patman Act was not violated.

This holding makes it unnecessary to reach the question of whether such a Robinson-Patman violation should be a complete defense to a Sherman Act § 1 violation. *See Kentucky Rural Electric Corp. v. Moloney Electric Corp.,* 282 F.2d 481, 484 (6th Cir. 1960), *cert. denied,* 365 U.S. 812, 81 S.Ct. 692, 5 L.Ed.2d 691 (1961) (held § 2(c) violation was defense to plaintiff's claim under other sections of the Robinson-Patman Act); *cf. United States v. United States Gypsum Co.,* 550 F.2d 115 (3d Cir.), *cert. granted,* 434 U.S. 815, 98 S.Ct. 52, 54 L.Ed.2d 71. Moreover, the Court notes that it is somewhat disingenuous of Amstar to assert such a defense when the evidence in the record suggests that the terminations were not motivated by a desire to avoid such violations.

## CONCLUSION

Defendant's motion for judgment notwithstanding the verdict is denied; decision on plaintiffs' attorneys' fee application is deferred pending appeal.

The Court believes that the interests of justice require that judgment be entered *nunc pro tunc* as of March 17, 1977, the date of the jury's verdict.

Settle judgment on notice.

---

26. *See Food Fair Stores, Inc., supra; Tillie Lewis Foods, Inc. v. Flotill Products, Inc., supra,* 65 F.T.C. at 1111, 1114; *id.* at 1149–50 (Elman, Comm'r, concurring); *cf. In re Hruby,* 61 F.T.C. 1445 (1962). *See also In re Borman Food Stores, Inc.,* 81 F.T.C. 201, 203 (1972) (Elman, Comm'r, dissenting from issuing complaint) (*Food Fair* case). *See generally Note, Beleaguered Brokers: The Evisceration of Section 2(c) of the Robinson-Patman Act,* 77 *Harv. L.Rev.* 1308 (1964).